## COMMISSIONER OF INTERNAL REVENUE v. HOPKINSON.

### No. 37.

Circuit Court of Appeals, Second Circuit.

March 6, 1942.

Samuel O. Clark, Jr., Asst. Atty. Gen. and Sewall Key and A. F. Prescott, Sp. Assts. to the Atty. Gen., for petitioner.

Herman Goldman, of New York City (Milton J. Levitt, of New York City, of counsel), for respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The Commissioner determined deficiencies in the income taxes of the respondent for each of the calendar years 1934 and 1935 by treating as ordinary income certain payments made to her as the beneficiary of a trust which she had reported as capital gains. The Board upheld the taxpayer and the Commissioner filed a petition to review its decision. The issues in this respect are the same for both years. There is an additional issue for 1935. In that year the trustee paid $7500.00, out of the income of the trust which would otherwise have been distributable to the respondent, for legal services. She did not report that as part of her gross income. The Commissioner included it in determining the deficiency for that year but the Board reversed.

It found the facts as follows:

"Prior to May 12, 1930, Ernest Hopkinson, the husband of petitioner, was the owner of certain inventions pertaining to the manufacture of tires and tire fabrics. He had received United States and foreign letters patent on some of these and had filed applications for both domestic and foreign letters patent as to others. On May 12, 1930, Hopkinson entered into a written agreement with United States Rubber Co. which recited that he was the 'seller' and the company was the 'purchaser' of certain patents and inventions and also mentioned a desire to terminate a prior license agreement between Hopkinson and the company. The agreement reads in part as follows:

"The Seller has granted, bargained, sold, conveyed, transferred, assigned, set over and delivered and by these presents does grant, bargain, sell, convey, transfer, assign, set over and deliver unto Meyer Rubber Company, a New Jersey corporation and a subsidiary of the Purchaser, the following:

"[There then follows a list of the patents and patent applications covered by the agreement] and the Seller agrees that he will execute on behalf of the said subsidiary or any assignee of same or successor assignee, all necessary or proper instruments and will do all other or further acts which may be required by the Purchaser or said subsidiary or assignee or successor assignee for the full and complete transfer of all the right, title and interest of the Seller in said Letters Patent and the inventions subject thereof to said subsidiary or assignee or successor assignee.

"The Rubber Co., as 'consideration for the sale of all the present inventions and improvements referred to', agreed to pay Hopkinson certain amounts in respect of each tire casing manufactured by it or its subsidiaries, a fraction of any royalties received by the Rubber Co. from licensees, and other amounts representing portions of proceeds of sales of weftless fabrics, in so far as the tires and fabrics were made under the Hopkinson patents. In case the Rubber Co. should desire to sell any of the patents or in the event of Hopkinson's death, the Rubber Co. could resolve all further payments, due on the patents under the contract, with lump sum payments to be arrived at either by agreement or by appraisers appointed by the parties. Pursuant to this agreement, Hopkinson executed formal assignments of his patents and patent applications to the Rubber Co., and the assignments were thereafter duly recorded. Hopkinson was not in the business of selling patents on or prior to May 12, 1930.

"Prior to July 17, 1932, Hopkinson received, pursuant to the agreement, amounts in excess of the cost or other basis to him of the inventions, patents, and patent applications covered by the agreement. He did not report any profit derived by him under the agreement on the installment basis.

"On July 19, 1932, Hopkinson, without consideration and as a gift, executed an indenture of trust whereby he transferred to himself as trustee the above mentioned agreement with the Rubber Co. The beneficiary of the trust was Bessie B. Hopkinson, the petitioner. The indenture gave Hopkinson, as trustee, power to ask for and receive all royalties and payments due under the agreement and to take any legal steps necessary or proper for the complete enjoyment of the assigned contract and the protection and enforcement of the trustee's rights thereunder. In addition, with respect to the assigned contract, the trustee was to have the right to exercise all rights, powers, and privileges

which it would have been lawful for the settlor to exercise during the term of the trust had the contract not been assigned. The payments received by the trustee pursuant to the assigned contract were, under the trust, to be distributed to petitioner upon receipt by the trust, except that lump sum payments were to be invested and the income therefrom paid over to petitioner quarterly. The trustee was authorized to employ counsel and to pay their compensation out of trust income. The trust was to be irrevocable and was to terminate at the end of three years, or upon the death prior to that time of either the settlor or petitioner.

"The trust indenture was modified without consideration on December 30, 1932, by a written agreement between Hopkinson and petitioner. The principal material changes were to provide that the royalties and other payments should be paid over to petitioner during her life and that upon her death all rights under the contract with the Rubber Co. should pass to the lawful surviving issue of the settlor and the trust should terminate. If any such child were under age at petitioner's death, the trust continued as to him until he should reach the age of 21, with interim discretionary payments of income for his support and maintenance. Russell Hopkinson was to become successor trustee if Ernest Hopkinson should die prior to the termination of the trust. In all other respects the original trust indenture remained operative.

"Ernest Hopkinson died a resident of the County and State of New York on May 3, 1933. Following his death, Russell Hopkinson became trustee under the indenture of trust as modified.

"On August 9, 1934, Russell Hopkinson, as trustee, and the Rubber Co. entered into an agreement dated as of January 1, 1934, modifying the original agreement of May 12, 1930, between Ernest Hopkinson and the Rubber Co. The modification provided for payments of various sums in settlements of disputes between the parties and for other amounts based on moneys received by the Rubber Co. from its licensees.

"During 1934, the trustee received $158,850.97 from the Rubber Co. pursuant to the contract as modified, and during 1935, $92,371.14.

"The fiduciary returns for 1934 and 1935 of Russell Hopkinson as trustee treated as taxable income only a portion of the above mentioned amounts. The portion of the amount which was received with respect to each of the letters patent and patent applications which was included as taxable income was determined in accordance with the provisions of section 117 of the Revenue Act of 1934, 26 U.S.C.A.Int.Rev. Acts, page 707, on the theory that the patents and patent applications were capital assets and were held by the taxpayer for the length of time elapsing between the dates of the applications for the various patents and the date of the sale thereof, namely, May 12, 1930. The respective holding periods are not in issue, and it is stipulated that the various patents and patent applications were held for the periods shown in the stipulation of facts.

"In computing the net income of the trust for the year 1935, the trustee deducted from the gross income thereof reported on the return the sum of $7,500, representing legal expenses. This sum was paid out by the trustee during 1935 from trust income. The legal services consisted of tax advice, advice as to the modification of the agreement with the Rubber Co., and counsel as to the assignment of petitioner's beneficial interest to her children.

"In both years petitioner reported in her individual returns the net income reported by the trustee in his fiduciary returns."

When the Commissioner first determined the deficiencies he did so partly on the ground that the contract was not for the sale of capital assets but merely for the payment of royalties. He did not rely upon this contention before the Board but wishes to do so now. We think that is permissible under Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037, as the respondent has been put to no disadvantage by way of surprise; has filed, by leave, a supplemental brief covering that issue; and no facts not already of record are required for decision.

A consideration of parts of the contract, which the Board had before it but had no occasion to include in its findings in view of the Commissioner's then apparent willingness to treat the contract as one for the sale of capital assets, shows that the parties throughout used language apt to transfer to the purchaser, so-called, all of the rights of the seller. The contrast between it and a contract for royalties is made especially plain by the fact that a then existing royalty agreement between

the parties was expressly cancelled. Their intention, as shown by their language in the contract, was to have the "seller" sell and the "purchaser" buy the property. The payment of the purchase price was to be in accordance with a computation to be made by using a stated amount per unit manufactured by the purchaser or any of its subsidiaries or affiliated companies under the patents or inventions; adjustable, however, to a percentage of the royalties payable to the purchaser should it grant licenses under which it would receive royalties having an average rate less than it was paying the seller. The purchaser also agreed to pay the seller one-fifth of the net royalties received by it or any of its subsidiaries or affiliated companies from licensees not subsidiaries or affiliated companies of the purchaser and was to make other payments equal to a portion of the proceeds of its sales of products made under the patents. There were also contingent provisions for making lump sum payments in lieu of a continuing series of payments. This manner of paying for the property by the purchaser was but an installment plan which did not lessen the full and complete title to the property which was transferred to the purchaser and which gave it the rights of an absolute owner. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904; Littlefield v. Perry, 21 Wall. 205; 88 U.S. 205, 22 L.Ed. 577; Rude v. Westcott, 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888; Green v. Le Clair, 7 Cir., 24 F.2d 74. Consequently, payments received by the seller after his basis had been extinguished would have been taxable to him as capital gains from the sale of property. Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143.

■ The issue more difficult to decide and the one upon which the Commissioner more relies is whether the installments on the purchase price of the property sold by Mr. Hopkinson which were distributable to the respondent retained their character for purposes of taxation when received by her, as proceeds from the sale of capital assets. There is no statute which expressly so provides and, so far as we are aware, there is no decision, previous to that of the Board, which is directly in point. They do, however, have the same tax status in her hands that they would in the hands of the trustee. McNaghten v. United States, Ct.Cl., 17 F.Supp. 509.

The statutory plan for the taxation of capital gains does shed some light on the subject. Congress was aware when it enacted the net capital gains provisions that high surtaxes were preventing the sale or exchange of property because gains and profits which were in fact the result of enhancement in value over a number of years were all treated as taxable income for the year in which the gains or profits were realized by sale or exchange. See House Rep. 350, 67th Congress, First Session, p. 10 [1939-1 Cum.Bul. (Part 2) 168, 176]. It undertook to relieve this situation, and that purpose is discernible as a continuing factor in the Revenue Act of 1934. In § 113 (a) of that Act, 26 U.S.C.A.Int.Rev.Acts, page 696, the basis of property is made its cost with certain exceptions. One of them now of interest is subdivision (3) which provides that, "If the property was acquired after December 31, 1920, by a transfer in trust (other than by a transfer in trust by a bequest or devise) the basis shall be the same as it would be in the hands of the grantor, increased in the amount of gain or decreased in the amount of loss recognized to the grantor upon such transfer under the law applicable to the year in which the transfer was made." And in § 117 (c) (2) of the same Act the period for which a taxpayer has held property however acquired is tacked to "the period for which such property was held by any other person, if under the provisions of section 113, such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person."

It follows that, had Mr. Hopkinson transferred in trust the actual property he sold to the Rubber Company instead of the right to receive the proceeds of that sale, the basis of that property in the hands of the trustee would have been the same as if Mr. Hopkinson had kept it; and if the trustee could have sold, and did sell it, the taxable percentage of any gain so realized would have been that established by § 117.

■ Sec. 117 (a) states the general rule to be that, "In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income;" and gives such

percentages. It does not expressly provide that it applies only when the taxpayer makes the sale or exchange by which the gain or loss is realized. It is true that the respondent is trying to take advantage of a statute of exemption and must bring herself within it even though all fair doubts are to be resolved against her. Heiner v. Colonial Trust Co., 275 U.S. 232, 48 S.Ct. 65, 72 L.Ed. 256; Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29. Yet a construction which does no violence to the language of the statute and does carry out the evident purpose of Congress is not only permissible but desirable. Nor will a statute be strictly held to its letter if that will defeat its intended purpose. Helvering v. New York Trust Company, 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361; Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211.

We think it abundantly clear that Congress intended the taxpayer of § 117 to be the person who actually or constructively received the proceeds of the sale, either by virtue of the contract of sale or of an assignment of it whenever that person, though not the actual seller, is one who would have taken the adjusted basis of the seller under § 113 (a) (3), and consequently the holding period of § 117 (c) (2), had the property been received and sold by such person to realize capital gain. The transfer of the contract in trust made the respondent the "taxpayer" as to so much of the income as was distributable to her. That income was entirely from gains resulting from the sale of capital assets. It was the substance of the gift to the trust. In determining whether any of it was taxable gain (income) at all the basis of the seller had to be deducted from what had been paid in before, and, if necessary after, the transfer of the contract in trust. Until the seller's basis had been equalled by the payments made there would be no gain from the sale to be taxed. As the result of the sale in this respect determines the taxability as gain or profit of what is received under the contract no matter whether the seller or his donee in trust is the recipient, resort should be had to the same contract of sale and its result, since the statute does not otherwise provide, to determine what kind of income taxwise the donee in trust does receive. Not to do so would, at least partially, defeat the purpose of Congress in taxing only

a portion of what are in fact capital gains. A seller of capital assets on the installment plan who contemplated the making of a gift of the proceeds might well be deterred from making the sale with its consequent realization of capital gains to be taxed if his donee were taxed on such gains as on ordinary income. Far from being a strain upon the statutory language, it is in line with its apparent purpose to tax a donee of the proceeds of a sale of capital assets in the same way the donor would have been taxed, had he, instead of his donee, been the recipient of them. Here, as in a somewhat analogous situation in New York Trust Co. v. Commissioner, 2 Cir., 68 F.2d 19, affirmed sub. nom. Helvering v. New York Trust Co., 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361, the acceptance of the gift in trust by the respondent is to be regarded as a vicarious substitution of herself for the donor. Compare, Edward G. Swartz, Inc. v. Commissioner, 5 Cir., 69 F.2d 633.

The Board was also right in disallowing the Commissioner's inclusion in the gross income of the respondent for 1935 of the counsel fee paid in that year by the trustee from the trust income. She was taxable only on what was distributed or distributable to her. If the fee was payable by the trustee in accordance with the terms of the trust out of trust income, that lessened pro tanto the amount distributable to the respondent. It was so payable to the extent that the advice was procured to enable the trustee to perform his duty. The Commissioner insists that part of the fee was paid "for services rendered the taxpayer." If so, that would require a remand for the purpose of determining how much was so spent, for anything paid by the trustee to discharge the respondent's debt should be treated as income distributed to her. But the record does not show that to be the fact. The advice was found to concern in part the respondent's assignment of her beneficial interest to her children, but the Board held that "the tax status and assignability of all interests under the trust were of equal interest to the trustee and fell within the class of objects for which the trustee was specifically authorized to procure legal assistance." That is in accord with the record made and we are bound by it. Whether or not the trustee might take the deduction is beside the point for the trustee's taxes are not in issue and deci-

sion here turns merely upon whether any part of the fee was income distributable to the respondent.

Affirmed.