The **FIRST NATIONAL BANK OF PRINCETON**, as Executor of the Last Will and Testament of Hereward Lester Cooke, deceased, Plaintiff,

v.

.UNITED STATES of America, Defendant.

Civ. A. 94–54.

United States District Court
D. New Jersey.

Dec. 30, 1955.

J. Seymour Montgomery, Princeton, N. J., for plaintiff.

Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., by George H. Barlow, Asst. U. S. Atty., Trenton, N. J., for defendant, H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Carrington Williams, Special Assts. to the Atty. Gen., of counsel.

FORMAN, Chief Judge.

Hereward Lester Cooke, whose executor is plaintiff herein, was a Professor of Physics at Princeton University, specializing in optics and acoustics. One morning while Professor Cooke was brushing his teeth he discovered that he, too, was a victim of "pink toothbrush." Examination led him to the conclusion that his discomfort was caused by jagged and split bristle ends that were visible only to the microscope-aided eye. Professor Cooke then turned his energies toward finding a cure for this annoyance. He solved the problem with a uniquely-designed machine which could grind toothbrush bristle ends into round contour. This invention was patented by Prof. Cooke[1] and these patent rights

1. U. S. Patent Number 2,066,068 issued Dec. 29, 1936 for "brush".

U. S. Patent Number 2,227,126 issued Dec. 31, 1940 for "brush and manufacture thereof."

were acquired from him by the Pro Phy Lac Tic Brush Co., which paid Prof. Cooke royalties for their use. Until his death on September 30, 1946 Prof. Cooke reported his income from Pro Phy Lac Tic as ordinary income. The executor now charges that this was error and that the proceeds received by Prof. Cooke from Pro Phy Lac Tic were actually capital gain. Suit has been brought against the United States for the difference between the ordinary income tax Prof. Cooke and his executor actually paid for the years 1944, 1945 and 1946 and what they should have paid treating the income from the patents as long term capital gain.

The complaint clearly sets forth the alternative legal theories upon which the plaintiff seeks recovery. Throughout the complaint the allegation is consistently made that the contract between Prof. Cooke and Pro Phy Lac Tic in 1940 constituted an instrument of sale of Prof. Cooke's Patent rights to Pro Phy Lac Tic. That there was a sale must be established because long term capital gain can only arise upon the "sale or exchange of a capital asset held for more than 6 months". 26 U.S.C.A. § 117(a) (4).[2]

After pleading that there was a sale of patent rights by Prof. Cooke to Pro Phy Lac Tic, the complaint sets forth facts designed to establish a partnership among Prof. Cooke and two of his friends in the development of the patent. Mr. Edmund Q. Moses, a patent attorney, is alleged to have been given a 10% interest in the patent in return for his contribution of services and Mr. Donald T. Carlisle a like interest (later increased to 20%) in return for his efforts in promotion of the patent. Since it is not controverted that the sole purpose of this partnership (if there was one) was to develop its only asset—the patent—it is alleged that the "sale" to Pro Phy Lac Tic was therefore the sale of a capital asset as defined by 26 U.S.C.A. § 117(a) (1) and that therefore income from that sale was capital gain.[3]

Plaintiff's alternative theory would admit the government's contention that Messrs. Moses and Carlisle were not partners with Prof. Cooke but were actually his employees. This it is said would not preclude capital gain treatment inasmuch as Prof. Cooke was an amateur inventor and thus the patent he held was not "stock in trade" or "inventory" or "property held * * * primarily for sale to customers in the ordinary course of his trade or business" under 26 U.S.C.A. § 117(a) (1).

The total amount of tax refund claimed is $16,642.39 which includes payments made by Prof. Cooke during 1944, 1945 and 1946 and a payment made by his executor after Cooke's death on September 30, 1946.

Evidence was taken and arguments oral and written have been submitted.

The issues to be resolved are first, whether the agreement entered into on August 7, 1940 between Prof. Cooke and Pro Phy Lac Tic is properly interpreted as an agreement of sale or assignment of patent rights or whether it was merely an agreement licensing Pro Phy Lac Tic to use the patent rights; second, if there was a sale, whether there was a partnership in the patent rights entered into by Prof. Cooke and Messrs. Carlisle and Moses, and if such a partnership is

Canadian Patent Number 359,372 issued July 28, 1936 for "brush and manufacture thereof."

2. There is no dispute in this case concerning the required 6 months' holding period.

3. "The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers ·in the ordinary course of this trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l) * * *." 26 U.S.C.A. § 117(a) (1).

found, whether the sale of the sole asset of that partnership is entitled to capital gain treatment; and, if it is found that sole ownership of the patent rights remained in Prof. Cooke, whether he was in the business of making and selling inventions in such a manner that the patent rights here in question were sold as part of his "stock in trade" or "inventory".

## I. Was There A Sale?

To prevail under either one of its theories plaintiff must first establish that there was a sale of patent rights to Pro Phy Lac Tic. If the agreement constituted no more than a license of patent rights rather than a sale, plaintiff has failed to prove an essential element of a capital transaction. A fair summary of the contract executed by Prof. Cooke and Pro Phy Lac Tic on August 7, 1940, is as follows:

1. Pro Phy Lac Tic acquired the exclusive right to manufacture, use and sell toothbrushes under the patents in the United States and Canada.

2. Pro Phy Lac Tic was to pay Prof. Cooke 1/3 of a cent royalty on each brush sold under the agreement, with a minimum royalty of $1,500 per quarter.

3. Pro Phy Lac Tic became obligated to use the Prof. Cooke invention on all of its higher-priced toothbrushes, with the right to use it on other toothbrushes.

4. Prof. Cooke agreed to defend at his own expense patent infringement suits brought against Pro Phy Lac Tic, and to save Pro Phy Lac Tic harmless therefrom.

5. Pro Phy Lac Tic had the right to cancel at will upon giving six months' notice; it could cancel immediately should the patent be declared invalid by a United States Circuit Court of Appeals.

6. Prof. Cooke could cancel if, as a result of a cease and desist order of the Federal Trade Commission, the sale of brushes under the invention was forbidden or seriously curtailed.

7. Pro Phy Lac Tic agreed to keep full accounts showing the number of brushes sold and to make its records available to Prof. Cooke.

8. Prof. Cooke had the right to cancel upon default of Pro Phy Lac Tic in rendering payments.

9. The parties gave the contract the appellation "license agreement".

10. Pro Phy Lac Tic was forbidden to transfer the rights it acquired in the Cooke patents except to a successor in business.

11. The duration of the agreement was to be for the life of the patent.

The provisions of the contract urged by the United States as establishing its identity as nothing more than a license agreement are (1) the provisions for royalty payments; (2) Prof. Cooke's obligation to defend patent infringement suits against Pro Phy Lac Tic at his own expense and save Pro Phy Lac Tic harmless therefrom; (3) the various provisions dealing with rights to terminate the contract; (4) the fact that the parties called the contract a "license agreement"; and (5) the provision forbidding transfer by Pro Phy Lac Tic of rights acquired under the contract except to a successor in business. The United States also argues that Cooke's reservation of rights to use his invention on other than toothbrushes compels the conclusion that no *sale* of Cooke's patent rights took place.

■ The government supports its contention that payments based upon the quantity of merchandise sold by the recipient of the patent rights forces a conclusion that the exchange of those rights took place by license rather than sale with the case of Bloch v. United States, 2 Cir., 1952, 200 F.2d 63, 64, certiorari denied 1953, 345 U.S. 935, 73 S.Ct. 796, 97 L.Ed. 1362. That case may be differentiated by pointing out that there the sale-license issue arose under 26 U.S. C.A. § 211(a) which imposes a tax upon " 'the amount received, by every nonresident alien individual not engaged in trade or business within the United States, from sources within the United States as * * * rents' ". The scope

of this tax imposition embraces royalties. Rohmer v. Commissioner of Internal Revenue, 2 Cir., 1946, 153 F.2d 61, certiorari denied 1946, 328 U.S. 862, 66 S. Ct. 1367, 90 L.Ed. 1632. The tax imposed by § 211 is to be withheld at the source of income within the United States under 26 U.S.C.A. § 143. Since tax on gain from the sale of personal property is not subject to withholding under § 143, Commissioner v. Celanese Corp., 1944, 78 U.S.App.D.C. 292, 140 F.2d 339, 340, the sale-license issue with regard to the transfer of patent rights arose in the Bloch case out of the question of whether the payments made to the inventor were subject to withholding, and did not arise under the provisions of the capital gains law, 26 U.S.C.A. § 117, which govern this case. This distinction between the Bloch case and the cases arising under 26 U.S.C.A. § 117 was noted in United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21, 26. Moreover, in the Bloch case the court quotes with seeming approval its earlier statement in General Aniline & Film Corp. v. Commissioner of Internal Revenue, 2 Cir., 1944, 139 F.2d 759 that " * * * 'the passing of title does not preclude the existence of royalties.'" 200 F.2d at page 66. It does not appear to be the law even in the Second Circuit that provision for payment in the nature of royalties forbids a conclusion that it was the intent of parties to an instrument transferring patent rights that title should pass.[4] See also Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406.

There is an impressive array of authority contrary to the contention of the government. Watson v. United States, 10 Cir., 1955, 222 F.2d 689, 691; United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21, 26; Commissioner v. Celanese Corp., 1944, 78 U.S.App.D.C. 292, 140 F.2d 339; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406, 409–410; Kronner v. United States, 1953, 110 F.Supp. 730, 734, 126 Ct.Cl. 156; Lamar v. Granger, D.C.W.D. Pa.1951, 99 F.Supp. 17, 36, 38. See also Allen v. Werner, 5 Cir., 1951, 190 F.2d 840.

Neither can the government prevail in its contention that the obligation of Prof. Cooke to defend patent infringement suits brought against Pro Phy Lac Tic because of the patents originally held by him and to save Pro Phy Lac Tic harmless therefrom constitutes the reservation by Prof. Cooke of a proprietary interest in the patents sufficient to preclude the existence of a sale. There is no inconsistency between the passage of title to a purchaser of a patent and an obligation of the vendor to defend assaults upon the purchaser's title and to make good his damages, if any, arising out of use of the supposed rights conveyed. It has been said of an agreement to defend infringement suits that " * * * it was analogous to a covenant to defend title, a common provision in most deeds of conveyance of real property." Commissioner of Internal Revenue v. Celanese Corp., supra, 140 F.2d at page 342. See also Watson v. United States, 10 Cir., 1955, 222 F.2d 689, 692.

The government is in no better position when it argues that the various cancellation clauses of the 1940 agreement show the parties' intent to create a license and not a sale. It is uniformly held that such provisions may be construed as calling for the reversion of ti-

---

4. Compare the government's theory of the effect of providing for payment by royalties upon the sale-license issue with § 1235 of the 1954 Internal Revenue Code, 26 U.S.C.A. § 1235(a) which provides that:

"A transfer * * * of property consisting of all substantial rights to a patent * * * shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred."

tle upon the occurrence of a condition subsequent and as such do not impair passage of title at the time the contract is executed. Prof. Cooke had the right to cancel (1) if as a result of a cease and desist order of the Federal Trade Commission the sale of brushes under the invention was forbidden or seriously curtailed and (2) if Pro Phy Lac Tic defaulted in rendering payments. Similar cancellation rights in the assignor have been present in agreements held to constitute a sale of patent rights for tax purposes. Allen v. Werner, 5 Cir., 1951, 190 F.2d 840 (vendor could cancel if vendee violated the agreement "in any way") ; Commissioner v. Celanese Corp., 1944, 140 F.2d 339, 342 (vendor could cancel if purchaser goes into bankruptcy or receivership) ; Kronner v. United States, 1953, 110 F.Supp. 730, 733, 734 (vendor could cancel if vendee failed to "use its best efforts in marketing the invention") ; Lamar v. Granger, D.C.W. D.Pa.1951, 99 F.Supp. 17, 37–38 (vendor could cancel if royalties not paid as provided for or in event of vendee's bankruptcy). Pro Phy Lac Tic had cancellation rights (1) should the patent be declared invalid by a United States Circuit Court of Appeals and (2) it could cancel at will upon giving six months' notice. In Allen v. Werner, supra, the agreement there in question was defined as a contract of sale of the patent despite a provision whereby the vendee "may cancel on 90 days written notice", 190 F.2d at page 842; and in Kronner v. United States, supra, a clause permitting the vendee to cancel if it found production under the patent "impractical" did not preclude the conclusion that a sale of the patent had transpired. There is no reason to change that result here simply because of the presence of the additional cancellation right on the part of Pro Phy Lac Tic that it could cancel if the patent were declared invalid by a United States Court of Appeals.

■ The fact that the parties to the agreement here in question called it a "license agreement" and referred to themselves as "licensor" and "licensee" is, of course, a factor relevant to interpretation. E. W. Bliss Co. v. United States, 1920, 253 U.S. 187, 192, 40 S.Ct. 455, 64 L.Ed. 852. But it is not a controlling circumstance. Many contracts transferring patent rights have been construed as contracts of sale even though the terminology "licensor" and "licensee" was used. See, for example, United States v. Carruthers, supra, and Allen v. Werner, supra. In Pike v. United States, D.C.D.Conn.1951, 101 F.Supp. 100, 101, despite the fact that the contract specifically provided " 'This agreement shall be construed as a license of the aforesaid patents and not an assignment thereof * * *'", it was held that the overall operative intent controlled and that the plaintiff inventor had sold his patent rights thereby qualifying for the favored capital gain tax treatment. 101 F.Supp. at page 101. See also Watson v. United States, supra, 222 F.2d at page 691.

■ The presence of a restraint upon alienation of rights acquired from Prof. Cooke by Pro Phy Lac Tic except to its successor in business is another clause insufficient by itself to bar giving effect to the instrument here in question as a sale for tax purposes. A provision identical to this was present in Allen v. Werner, supra, and did not prohibit a finding that a sale had taken place and the taxpayer in Watson v. United States, supra, was given capital gain treatment despite a provision to the effect that the party to whom he had sold his patent could not divest himself of all or part of those rights without the taxpayer's written consent. 222 F.2d at page 691.

■ Perhaps the most forceful argument made by the government on this phase of the case is its contention that the retention by Prof. Cooke of allegedly substantial rights in the patent precludes a finding that a sale was made. Prof. Cooke granted Pro Phy Lac Tic the exclusive right to manufacture use and sell only toothbrushes under the patent. He retained the rights to use the invention on other kinds of brushes. Indeed, he fruitlessly negotiated with Pro

Phy Lac Tic concerning possible use of his invention for industrial purposes and his heirs in 1948 granted Pro Phy Lac Tic the right to use the invention on hair brushes. Thus, Pro Phy Lac Tic's exclusive right was only industry wide. The argument that this circumstance bars finding that a sale was made was rejected in United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21. There the patent rights granted were limited to the "tuna canning industry" although the invention possibly had utility for other purposes as well. Recognizing that a patent transfer can be limited to a geographical area and still be in legal contemplation an assignment or sale, the court there confessed itself unable to see why a different rule should apply where the area of limitation is industrial rather than geographical. 219 F.2d at pages 24–25. Despite the limitation of patent use to a single industry, the transaction was given capital gain status. The reservation by Prof. Cooke here was like that in the Carruthers case—its monetary value was highly speculative. It was established at the trial of this case that the round-ended bristle idea had very little intrinsic merit. Tests showed that any toothbrush bristle was ground round-ended by a week's normal use. The value of the idea was wholly promotional and Pro Phy Lac Tic was somewhat timid on this score because it did not want to be found guilty of making extravagant claims. The 1940 contract to Pro Phy Lac Tic was a grant of substantially all of Prof. Cooke's valuable interests in the patent.[5] But even with the reservation of rights for use in other industries, the grant to Pro Phy Lac Tic may still qualify as a sale for tax purposes. United States v. Carruthers, supra; Lamar v. Granger, D.C.W.D.Pa. 1951, 99 F.Supp. 17, 36–37. But cf. American Chemical Paint Co. v. Smith, D.C.E.D.Pa.1955, 131 F.Supp. 734.

After submission of this case, the court's attention was called by the government to the very recent case of Switzer v. Commissioner, 6 Cir., 1955, 226 F.2d 329. Both parties submitted briefs in comment on that case. In it the Tax Court's determination that the agreement transferring patent rights was merely a license was affirmed. The Tax Court's opinion shows that the agreement in it was materially different from the one being interpreted here. It concluded, "We think Switzer Brothers, Inc., simply stepped into the shoes of the former partnership as licensee of petitioners and that the payments petitioners received from Switzer Brothers, Inc., were in fact royalties * * *". The factual complex in the Switzer case simply has no relation to the circumstances of this case and the decision consequently can have no application here.

The parties to the 1940 agreement in this case did nothing essentially different from that done in many other contracts which have been construed to be sales or assignments of patent rights. The provisions of the agreement here, since they are fundamentally consistent with the passage of title, must likewise be held to constitute a sale. Allen v. Werner, supra; United States v. Carruthers, supra; Lamar v. Granger, supra; Watson v. United States, supra.

II. Were The Patent Rights Acquired By Cooke Owned By A Partnership At The Time Of The Sale To Pro Phy Lac Tic?

Plaintiff very earnestly presses the contention that Prof. Cooke and Messrs. Carlisle and Moses were involved in a 70–20–10 partnership in the patents, and that in executing the instrument of sale with Pro Phy Lac Tic in 1940 Prof. Cooke acted as agent or trustee for the remaining partners. It appears that there may be very substantial tax differences depending upon whether a sale is of a business by a single proprietor or of a business interest by a partner. Compare Williams v. McGowan, 2 Cir.,

5. Again compare the language of § 1235 of the 1954 Code, supra, note 4: "A transfer * * * of property consisting of all *substantial* rights to a patent * * *." (Emphasis supplied.)

1945, 152 F.2d 570, with Hatch's Estate v. Commissioner, 9 Cir., 1952, 198 F.2d 26. See also Hollis v. United States, D. C.N.D.Ohio 1954, 121 F.Supp. 191, a case whose facts are highly analogous to those plaintiff asserts are present here. There a partnership was formed for the sole purpose of acquiring for resale some valuable oriental art objects. It was to be a "one venture proposition". Despite this, the assets were held to be ordinary, not capital, and their disposition a realization of ordinary and not capital gain under § 117. But the technical tax aspects of the disposition of partnership interests need not be resolved in this case since there was no partnership created by Prof. Cooke and Messrs. Carlisle and Moses.

■ The basic criterion in tax law of the creation of a partnership is the intent of the alleged partners. Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659. See also Gilford v. Commissioner, 2 Cir., 1953, 201 F.2d 735, 736. Fundamental indicia of the presence of intent to become partners is the parties' understanding and voluntary assumption of the burdens of partnership. The agreement executed by Prof. Cooke and Pro Phy Lac Tic contained a provision that he was to defend at his own expense any infringement suits brought against Pro Phy Lac Tic and to save the company harmless therefrom. This could have resulted not only in incurring an obligation to pay large legal fees, but could have resulted, had Pro Phy Lac Tic lost an infringement suit, in his liability for damages as well. But neither Mr. Carlisle nor Mr. Moses was able to testify that he had a specific understanding of his duties as a partner under the 1940 agreement. When they were asked what their reaction would have been had liability under the above clause been incurred by Prof. Cooke, they could give no more definite answer than that they would probably have done the gentlemanly thing and helped Prof. Cooke out to the extent of their interests. This lack of agreement or understanding among the alleged partners of their basic duties as partners forecloses a finding that they intended to become such prior to the 1940 agreement. This lack of understanding about basics is the more unfathomable when it is considered that one of the alleged partners, Mr. Moses, was a distinguished lawyer who certainly understood these fundamental consequences of any partnership agreement.

■ Plaintiff points out that "as early as 1944" Prof. Cooke, Mr. Carlisle, and Mr. Moses filed partnership returns for their income derived from Pro Phy Lac Tic's payment of royalties. But whatever may have been the motivation of partnership returns at that late date, such action cannot change the realities as they existed prior to 1940. Plaintiff also emphasizes the fact that Carlisle and Moses were to receive their percentages out of the "net" proceeds from the patent rather than the "gross". This is very weak evidence of partnership at best, and the parties' demonstrated lack of intent with regard to the assumption of the burdens of partnership destroys any valid inference that the relationship existed.

III. Were The Patent Rights Sold By Prof. Cooke His "Stock In Trade" or "Inventory"?

Besides carrying a full-time teaching schedule at Princeton University, Prof. Cooke was an active inventor in his special branches of physics—optics and acoustics. He held 19 United States patents in these fields. Twelve of the patents were held for exploitation by a corporation called Aero · Surveys, Inc. These were related patents, and among this group was one licensed to Bausch & Lomb. This was the only patent other than the toothbrush patents which ever proved profitable. Prof. Cooke owned 51% of the stock in the Aero Surveys corporation.

Seven of his patents were transferred to Cooke Patents, Inc., in which Prof. Cooke owned all but a negligible portion of the stock. None of these seven patents proved to be valuable. There can

be no doubt, however, that Prof. Cooke was the motivating force behind the creation of these corporations and that he actively desired the exploitation of his optical and acoustical patents for profit. It is on these facts that the government bases its argument that Prof. Cooke was in the business of making and selling inventions, and that consequently the sale to Pro Phy Lac Tic was the sale of property excepted from capital gain treatment by 26 U.S.C.A. § 117(a) (1).

But because Prof. Cooke may have been in the business of inventing in another field should not foreclose the possibility of capital gain treatment for him upon the proceeds of the only mechanical patent he ever held. If Prof. Cooke was in the business of making and selling optical and acoustical inventions, concerning mechanial inventions such as his scheme for grinding toothbrush bristles, he was completely an amateur. As an amateur inventor insofar as the toothbrush patents are concerned, the patents were a capital asset under 26 U.S.C.A. § 117(a) (1). Evans v. Kavanagh, D.C.E.D.Mich.1949, 86 F. Supp. 535, 538, affirmed *sub nom.* Kavanagh v. Evans, 6 Cir., 1951, 188 F.2d 234; Hofferbert v. Briggs, 4 Cir., 1949, 178 F.2d 743, 745.

The similarity of the properties held by Prof. Cooke in his dual capacities as alleged professional and amateur inventor should not be permitted to blur the distinction between capital gain and ordinary income. Such similarity was present in a case which in principle was much like the one *sub judice.* Lobello v. Dunlap, 5 Cir., 1954, 210 F.2d 465. There the taxpayers were admittedly in the business of buying and selling real property. One tract, however, was purchased for purposes of development. But because of shortages of building materials and under the urgings of prospective purchasers, the tract was subdivided and sold, until at the time the case was heard only 30% of the original area remained in the taxpayers' hands. It was held that the property sold from the tract acquired originally for development purposes was not "stock in trade" or "inventory" or "property held * * * primarily for sale to customers in the ordinary course of * * * trade or business" under 26 U.S.C.A. § 117(a) (1) but was a capital asset. The same conclusion is appropriate here assuming, *arguendo*, that Prof. Cooke was in the business of making and selling optical and acoustical patents. If so, it was that particular kind of patent Prof. Cooke held as "inventory", "stock in trade" or "property held * * * primarily for sale to customers in the ordinary course of * * * trade or business". He was not in the business of inventing generally, but particularly, in the limited fields of optics and acoustics. As in Lobello v. Dunlap, he acquired similar property under different circumstances and although this property was ultimately disposed of in the same manner as if it were "stock in trade" or "inventory", that alone does not preclude capital gain. To hold otherwise would be to aggrandize the *sale* requirement of the statute at the expense of ignoring the precise conditions under which property must be *held for sale* in the ordinary course of trade or business, in order to remove it from the capital asset category. As did the taxpayers in the Lobello case, Prof. Cooke did not hold this similar property "in the ordinary course of * * * trade or business" and it is this difference which separates the toothbrush patents from Cooke's other patents and elevates them to the status of capital assets.

The foregoing shall constitute findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Judgment will be entered for the plaintiff upon the submission of an order in conformity herewith.