WILLIAM S. ROUVEROL AND BEATRICE C. ROUVEROL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1796–62, 4150–62. Filed April 17, 1964.

*Henry M. Elson*, for the petitioners.
*Daniel L. Stewart*, for the respondent.

ARUNDELL, *Judge:* In these consolidated proceedings respondent determined deficiencies in income tax for the calendar years 1959 and 1960 of $571 and $694.55, respectively.

The only issue to be decided is whether certain amounts received by petitioners for the alleged transfer of patent rights are taxable as ordinary income or as long-term capital gains from the sale of capital assets.

FINDINGS OF FACT

The stipulated facts, together with the exhibits attached to the stipulation, are so found and are incorporated herein by this reference.

Petitioners are husband and wife and are residents of Berkeley, Calif. They filed joint Federal income tax returns for the taxable years 1959 and 1960 with the district director of internal revenue for the first district, at San Francisco, Calif.

Petitioner-husband, hereinafter sometimes referred to as petitioner, was an associate professor of mechanical engineering at the University of California, Berkeley, Calif., during the years 1959 and 1960.

In 1952 petitioner began working on the idea of a variable-speed transmission. Petitioner invented a new type of mechanical variable-speed transmission called a multiple-ball transmission, in February 1956. The invention is a basic generic invention and has potential application in the fields of vehicular propulsion, engine accessories, industrial drives, and instrument drives.

On September 24, 1956, petitioner filed an application for U.S. Letters Patent, Serial No. 611,485. On September 6, 1960, the patent was granted and numbered 2,951,384. Improvements to the invention were filed in 1957 and 1960. A patent (No. 2979970) has been granted for the improvements filed in 1957.

Petitioner filed applications for a patent in Great Britain on September 6, 1957, in France on September 20, 1957, in West Germany on September 13, 1957, in Italy on September 24, 1957, in Switzerland on September 19, 1957, in Sweden on September 12, 1957, and in Japan on September 21, 1957.

Petitioner has also filed applications for patents in Canada and Mexico.

On February 20, 1958, petitioner entered into a written agreement with Holley Carburetor Co., of Warren, Mich., hereinafter referred to as the first Holley agreement. In this agreement, which was headed "License Agreement," petitioner was called licensor and Holley Carburetor Co. was called licensee. The agreement recited that the licensor was the owner of certain inventions and that the licensee desired to obtain a license to use the inventions in the United States and certain foreign countries. Under the agreement, petitioner granted unto Holley Carburetor Co. "an exclusive right and license, with right to sublicense others, to make, have made, use and/or sell throughout North and South America, for engine accessories and other areas of application" except certain applications specifically excluded "units and/or parts thereof incorporating said inventions." The applications specifically excluded were "Main power transmissions for industrial prime movers or for propelling air, land or water vehicles."

Under paragraph 2 of the agreement, Holley Carburetor Co. agreed to grant to any reputable concern a limited sublicense "to make, use and sell" the said inventions that were covered by the agreement.

Under paragraph 3 of the agreement, Holley Carburetor Co. agreed to pay petitioner "a total royalty of 5% of Licensee's selling price or the selling price of any sublicensee" and a minimum royalty of at least $2,000 during the first year of the agreement and $1,000 during the third and each ensuing year.

Under paragraph 4 of the agreement, Holley Carburetor Co. agreed to keep and maintain full and complete records and books of account showing the units constructed and sold by it and by its licensees.

The first Holley agreement further provided:

5. It is the intention of the parties that said inventions be exploited commercially to the fullest possible extent consistent with sound preliminary research and it is the intent of this paragraph that this Agreement may be cancelled, in whole or in part by either party at his option in the absence of such exploitation in accordance with the provisions of paragraph 8 below.

\* \* \* \* \* \* \*

7. Licensor agrees to prosecute in his own name or defend, at Licensee's request, all cases of infringement or interference in fields within the scope of this License, Licensor and Licensee cooperating fully by furnishing witnesses and information and sharing equally all costs and proceeds of such litigation. \* \* \*

\* \* \* \* \* \* \*

8. Licensee may cancel this Agreement at any time provided all patent rights in said inventions acquired by Licensee from Licensor are returned to Licensor. Licensor (or Licensee) may cancel this Agreement in the event of a demonstrated failure of Licensee (or Licensor) to fulfill the conditions of any provision of this Agreement after due notice has been given and a 60-day period allowed for correcting an alleged failure. \* \* \*

On August 29, 1958, petitioner entered into a license agreement with Genisco, Inc., Los Angeles, Calif., hereinafter referred to as the Genisco license agreement.

According to the provisions of the Genisco license agreement, petitioner, as licensor, granted unto Genisco, Inc., as licensee, an exclusive right to make, use, and sell throughout Western Europe devices made in accordance with the patent applications filed in Great Britain, France, West Germany, Italy, Switzerland, and Sweden.

The Genisco license agreement limited the area of application of the inventions to flight simulation test equipment of the multiple-axis type or of the certrifuge or rate-of-turn type.

In the Genisco license agreement it is stated that it is contemplated that other licenses for other limited areas of application not in conflict with the license will be granted under the inventions to other licensees.

The Genisco license agreement provides that petitioner and the licensee shall both have the right, separately or in concert, to prosecute in fields within the scope of the agreement, all cases of infringement by others of any of the patents.

The Genisco license agreement provides that the licensee can cancel the license agreement at any time without cause by 30 days' notice in writing, and the petitioner can cancel the agreement in the event of a continued demonstrated failure of the licensee to fulfill the conditions of any provision of the license agreement, after due notice has been

given of an alleged failure and a 60-day period allowed for correcting the same or reaching a mutually satisfactory accord.

The Genisco license agreement also provided that Genisco would pay petitioner as partial consideration a total earned royalty of 6 percent of the selling price of each unit or part thereof incorporating one or more of the said inventions and a minimum royalty of $250 on the execution of the agreement and $500 during each ensuing calendar year.

On August 29, 1958, Holley Carburetor Co., as licensor; Genisco, Inc., as licensee; and petitioner entered into an agreement whereby Holley Carburetor Co. granted a sublicense to Genisco, Inc., to make, use, and sell throughout the United States and Canada units and/or parts thereof incorporating inventions relative to flight simulation test equipment of the multiple-axis type or of the centrifuge or rate of turn type.    Paragraph 15 of this agreement provided:

15. WILLIAM S. ROUVEROL warrants that Licensor has the right to make this Agreement, accepts the terms and conditions thereof and agrees that it shall remain in effect until cancelled as provided for herein and that he shall not do anything or enter into any Agreements in contravention thereof or in diminution of Licensee's exclusive license.  He further agrees that cancellation of Licensor's prior license shall not operate to cancel this Agreement, but this Agreement shall continue in full force and effect; in that event, all parties hereto agree that the rights and obligations of said Licensor under this Agreement shall thenceforthe [*sic*] inure to and be assumed solely by said WILLIAM S. ROUVEROL, said Licensor thereafter being relieved of all obligations hereunder.

On May 6, 1960, petitioner, as licensor, entered into a new license agreement with Holley Carburetor Co., as licensee, hereinafter referred to as the second Holley agreement, whereby the former agreement between the parties dated February 20, 1958, was canceled and new licensing provisions were adopted.

The second Holley agreement provided, in part, as follows:

1. Licensor hereby grants unto Licensee an exclusive right and license, including the right to sublicense others, to make, have made, use and/or sell throughout North, Central and South America, Transmissions, either separately, with a bypass system and/or as part of any other larger assembly, incorporating said inventions and having a rated output capacity not in excess of one-quarter [later, on December 31, 1961, changed to read "less than but not including one-half"] horsepower, and/or parts therefor, under the aforesaid patent application Serial No. 611,485 and under such other pertinent North, Central and South American patents or patent applications as have been or may hereafter be filed, controlled or acquired by Licensor relating to said Transmission.

The second Holley agreement also provided that Holley agreed to grant to any reputable concern a sublicense "to make, use and sell Transmissions" in the event that Holley was unable to supply the entire demand.  Holley also agreed to pay petitioner for each transmission or part thereof manufactured and sold under the agreement a

total royalty of 5 percent of Holley's selling price, or, in case of any sublicense, the selling price of the sublicensee, and, in any event, a minimum royalty of $6,000 for the first year, $8,000 for the second year, and $10,000 for each year thereafter. Holley also agreed to keep and maintain full and complete records and books of account showing the transmissions or parts thereof manufactured and sold by it or by its sublicensees. Petitioner agreed to prosecute in his own name or defend all cases of infringement or interference in connection with the patents. Paragraph 15 of the second Holley agreement provided in part as follows:

15. This Agreement shall remain in effect until cancelled, cancellation being only as provided for below.

Licensee may cancel this Agreement at any time without cause by thirty (30) days notice in writing, subject to the conditions set forth herein.

Licensor may cancel this Agreement in the event of a continued demonstrated failure of Licensee to fulfill the conditions of any provision of this Agreement, after due notice has been given of an alleged failure and a sixty (60) day period allowed for correcting the same, or reaching a mutually satisfactory accord or submitting differences to arbitration.

Licensor shall forthwith have the unrestricted additional right to cancel this Agreement at any time upon or after the filing by Licensee of a petition in bankruptcy or insolvency, or upon any adjudication by any court of competent jurisdiction that Licensee is bankrupt or insolvent, or upon the making by Licensee of any assignment or attempted assignment for the benefit of creditors.

Petitioner claimed depreciation allowances with respect to the patents covered by the agreements with Holley Carburetor Co. and Genisco, Inc., on his income tax returns for the years 1959 and 1960.

Holley Carburetor Co. is still developing the transmission and at the time of the hearing herein it was not in production. Genisco, Inc., was the only licensee to get its transmission into production, but has since abandoned its license.

### OPINION

The solution to the issue involved is whether the transfers under the several license agreements mentioned in our findings come within "A transfer * * * of property consisting of all substantial rights to a patent" as those words are used in section 1235(a), I.R.C. 1954.[1] This section was new in the 1954 Code. Almost 2 years later, on June 29, 1956, Congress amended section 117 of the 1939 Code by adding

---

[1] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

subsection (q)(1) thereto, which was substantially the same as section 1235(a) of the 1954 Code. "Certainly the courts have been quick to heed Congress' invitation to construe liberally sections 117 (q) and 1235." *Young* v. *Commissioner*, 269 F. 2d 89 (C.A. 2, 1959), affirming 29 T.C. 850, and citing eight cases for the quoted proposition. See also an extended detailed discussion of section 1235 in S. Rept. No. 1622,[2] 83d Cong., 2d Sess., pp. 438–440, and section 1.1235–2 of the Income Tax Regs.

The so-called multiple-ball transmission which petitioner invented is a basic generic invention which has potential application in the fields of vehicular propulsion, engine accessories, industrial drives, and instrument drives. In contending that petitioner did not transfer to Holley Carburetor Co. (hereinafter sometimes called Holley) and Genisco, Inc. (hereinafter sometimes called Genisco), "all substantial rights" to his invention, the respondent contends that the rights that were transferred were only segregated rights to some but not all of the valuable uses of the patents and also that there were substantial restrictions placed on the segregated rights that were transferred.

To be more specific, the respondent points out that in the first Holley agreement petitioner granted to Holley "an exclusive right and license, with right to sublicense others, to make, have made, use and/or sell throughout North and South America, for engine accessories and other areas of application, except those applications specifically excluded below" which were "Main power transmissions for industrial prime movers or for propelling air, land or water vehicles." Engine accessories were specifically defined in the agreement. This first Holley agreement was later canceled by Holley who, on May 6, 1960, entered into a second Holley agreement wherein petitioner granted to Holley "an exclusive right and license, including the right to sublicense others, to make, have made, use and/or sell throughout North, Central and South America, Transmissions * * * having a rated output capacity not in excess of one-quarter [later on December 31, 1961, changed to read less than but not including one-half] horsepower." In the Genisco agreement the respondent points out that petitioner granted to Genisco "an exclusive right and license to make,

---

[2] S. Rept. No. 1622 stated that under present law an express assignment of patent rights by the owner, or an exclusive license of the right "to manufacture, use, and sell" the invention for the life of the patent can qualify as a sale or exchange and thus obtain for the holder capital-gains treatment of such transfers even where payment takes the form of "royalty" payments, citing several cases. The report referred to Mimeograph 6490 (1950–1 C.B. 9) and said sec. 1235 was "To obviate the uncertainty caused by this mimeograph and to provide an incentive to inventors to contribute to the welfare of the Nation" and that "It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones."

use and sell throughout Western Europe, but only for the limited area of application of said inventions to flight simulation test equipment of the multiple-axis type or of the centrifuge or rate of turn type, units and/or parts thereof incorporating said inventions disclosed by the aforesaid patent applications and by such other pertinent patents or patent applications as have been or may hereafter be filed, controlled by Licensor relating to said inventions."

Whether the transfers to Holley and Genisco are transfers of property consisting of "all substantial rights to a patent" is such an issue which often becomes a factual question to be decided according to the facts and circumstances of each case and the peculiarities inherent in each patent. *Lawrence* v. *United States*, 242 F. 2d 542, 545 (C.A. 5, 1957) ; *Estate of Milton P. Laurent, Sr.*, 34 T.C. 385.

In the instant case petitioner has in effect divided his patents or patent applications into different fields of application and in the agreements with Holley and Genisco has transferred to each transferee the exclusive right and license to *make*, *use*, and *sell* throughout a specified territory all of the rights within a given field. The real question then is whether, under the provisions of section 1235(a), *supra*, a patent or patent application may be separated into different fields of application, and whether each field can be transferred to a different transferee with the transfer being considered under section 1235(a) as a sale or exchange of a capital asset. Petitioner argues there is ample authority to justify giving capital gains treatment to such transfers, citing *First National Bank of Princeton* v. *United States*, 136 F. Supp. 818 (D.N.J. 1955) ; *United States* v. *Carruthers*, 219 F. 2d 21 (C.A. 9, 1955) ; *Merck & Co.* v. *Smith*, 261 F. 2d 162 (C.A. 3, 1958) ; and *Estate of Milton P. Laurent, Sr., supra.*

The respondent contends that the instant case can be distinguished from the cases cited by petitioner but, even assuming, *arguendo*, that it is possible for a holder of patents or patent applications to make such a division into different fields of application, the evidence in the instant case, namely, the agreements with Holley and Genisco, does not show that petitioner either intended or effected the transfer of "all substantial rights" in any one of the different fields of application.

We agree with petitioner.

In *First National Bank of Princeton* v. *United States, supra*, the transaction concerned the transfer of patent rights to a certain machine which would grind brush bristles to a round contour. The transfer limited the rights of the transferee "to manufacture, use and sell *toothbrushes* under the patents in the United States and Canada." (Emphasis supplied.) Among other things, the Government argued

that the inventor's reservation of rights, to use his invention on all brushes other than toothbrushes, compelled the conclusion that no sale took place. The court, in deciding for the taxpayer, held otherwise.

In *Merck & Co.* v. *Smith, supra*, the patent in question covered certain chemical compounds known as sulfa drugs. The holder of the patent granted to a transferee the right to make, use, and sell one of the claims in the general patent, namely, sulfadiazine, and reserved the rights in the other claims to the transferor. Notwithstanding the reservation, the court found that there was a sale and ordered that the taxpayer be accorded capital gains treatment. In so holding, the court stated:

One generic patent was issued to the original patentee. But there were species claims and the species were separate inventions. A single patent may issue for two or more separate inventions as said in Special Equipment Co. v. Coe, 1945, 324 U.S. 370 * * *

\*    \*    \*    \*    \*    \*    \*

One who owns a single invention patent may "sell" its use in a particular territory or industry, United States v. Carruthers, 9 Cir., 1955, 219 F. 2d 21, or for one industrial use only, First National Bank of Princeton v. United States, D.C. D. N.J. 1955, 136 F. Supp. 818, 823–824. The owner of a copyright can, at least for having the transfer effective as a sale of capital, "sell" printing rights to one buyer and motion picture rights to another. * * * The same thing is true in the field of trademarks. * * *

To the same effect is our decision in *Estate of Milton P. Laurent, Sr., supra.*

The fact that in the several licensing agreements the parties are described as licensor and licensee and the payment as royalties is not conclusive for the respondent that the said agreements are true licensing agreements rather than sales or assignments. *Waterman* v. *Mackenzie*, 138 U.S. 252, 256 (1891); S. Rept. No. 1622, *supra; Watkins* v. *United States*, 252 F. 2d 722 (C.A. 2, 1958). In this connection, it is interesting to note that in *Pike* v. *United States*, 101 F. Supp. 100 (D. Conn.), the court held the subject agreement to be an assignment notwithstanding the fact that its very terms stated that it was to be construed as a license rather than an assignment, citing among other cases *Waterman* v. *Mackenzie, supra.*

Respondent also contends that "all substantial rights" were not transferred because both petitioner and his transferees, in each of the contracts, had the right to prosecute and defend infringement and interference suits. "Who must bring suit is a purely procedural matter and does not determine either way the effect of an attempt at transfer of an intangible right." *Merck & Co.* v. *Smith, supra.* See also *Roe* v. *United States*, 138 F. Supp. 567 (S.D. Tex. 1956). In

*First National Bank of Princeton* v. *United States, supra,* the court, among other things, said:

Neither can the government prevail in its contention that the obligation of Prof. Cooke to defend patent infringements suits brought against Pro Phy Lac Tic because of the patents originally held by him and to save Pro Phy Lac Tic harmless therefrom constitutes the reservation by Prof. Cooke of a proprietary interest in the patents sufficient to preclude the existence of a sale. There is no inconsistency between the passenge of title to a purchaser of a patent and an obligation of the vendor to defend assaults upon the purchaser's title and to make good his damages, if any, arising out of use of the supposed rights conveyed.

The respondent also makes a point that in the Genisco and in the second Holley agreement the licensee could cancel the agreement at any time without cause simply by 30 days' notice in writing. A transfer, however, may be an assignment even though the transferee has the right to cancel on notice. *Allen* v. *Werner,* 190 F. 2d 840 (C.A. 5, 1951); *Pike* v. *United States, supra; Bannister* v. *United States,* 262 F. 2d 175 (C.A. 5, 1958). The result is also the same where, as in the Genisco agreement, petitioner had the unrestricted right to cancel the agreement if at any time in his sole judgment the licensee's condition should be such as to endanger its ability to carry on its business and/or perform its obligations. In *Lamar* v. *Granger,* 99 F. Supp. 17 (W.D. Pa. 1951), the court, in considering a similar provision, said (p. 38):

These are common provisions nearly universally found in patent agreements. An individual of inventive mind rarely has the ability, financial or otherwise, to produce and market his invention. He has to depend upon others and it is a means of selfprotection to include such clauses; otherwise he is at the mercy of the assignee. It is the only control he has. The equity power of a court could not be availed of to compel specific performance. By the very nature of the relationship such clauses are included and to penalize the assignor by holding that such clauses make the sale a license is arbitrary and inequitable. Furthermore, the courts have recognized this and it is well settled that such clauses do not interfere with the passing of ownership (title) from the assignee, but operate as conditions subsequent. Waterman v. Mackenzie, supra * * *

We have carefully considered all of the arguments made by the respondent and are of the opinion that the decided cases, both prior and subsequent to the enactment of section 1235(a), *supra,* are favorable to petitioner's view that in these agreements he transferred to the transferees "all substantial rights" to his patents. *Waterman* v. *Mackenzie, supra; Edward C. Myers,* 6 T.C. 258. We hold, therefore, that the income in question is taxable as long-term capital gain rather than as ordinary income.

*Decisions will be entered under Rule 50.*