JOHN W. CHAMBERLIN AND MARIAN MCMICHAEL CHAMBERLIN, HUSBAND AND WIFE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63557, 63558, 63559. Filed August 20, 1959.

*Harvey W. Peters, Esq.*, and *William A. Jackson, Esq.*, for the petitioners.

*James T. Wilkes, Jr., Esq.*, and *Delman H. Eure, Esq.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in income tax and additions to tax for the

[1] Proceedings of the following petitioners are consolidated herewith: John W. Chamberlin, Docket No. 63558; Marian McMichael Chamberlin, Docket No. 63559.

above petitioners for the taxable years and in the amounts shown below:

| Year | Petitioner | Deficiency | Additions to tax, sec. 293(a), I.R.C. 1939 |
|------|-----------|-----------|------------------|
| 1947 | John W. Chamberlin | $23,502.98 | $1,175.15 |
| 1947 | Marian McMichael Chamberlin | 1,887.91 | (¹) |
| 1948 | John W. Chamberlin and Marian McMichael Chamberlin | 14,244.20 | 712.21 |
| 1949 | John W. Chamberlin and Marian McMichael Chamberlin | 22,007.44 | 1,100.37 |

¹ None.

Petitioners filed timely claims for refunds as follows:

| Year | Petitioner | Amount |
|------|-----------|--------|
| 1947 | John W. Chamberlin | $6,711.97 |
| 1947 | Marian McMichael Chamberlin | 6,477.93 |

The issues to be decided are:

(1) Whether the royalty payments received by petitioner John W. Chamberlin from Bendix Home Appliances, Inc., during the years 1947, 1948, 1949 are taxable as ordinary income or capital gain.

(2) Whether the royalty payments received by petitioner Marian McMichael Chamberlin from Bendix Home Appliances, Inc., during the years in issue are taxable as ordinary income or capital gain.

(3) Whether the royalty payments received by petitioner Marian McMichael Chamberlin from Borg-Warner Corporation during the years in issue are taxable as ordinary income or capital gain.

All other issues for each of the years have been settled by stipulation by the parties.

FINDINGS OF FACT.

The stipulated facts are found as stipulated and are incorporated herein by this reference.

Petitioners John W. Chamberlin, hereafter referred to as Chamberlin, and Marian McMichael Chamberlin, hereafter referred to as Marian, are husband and wife with their residence during the taxable years in question at 809 Brummel Street, Evanston, Illinois. Petitioners filed separate returns for 1947, Chamberlin with the collector of internal revenue for the district of Hawaii and Marian with the collector of internal revenue for the first district of Illinois. They filed joint returns for 1948 and 1949 with the collector of internal revenue for the first district of Illinois. Both reported their income for all years on a calendar year, cash basis of accounting.

In 1933, Chamberlin was issued a patent covering a cleansing machine he had invented. Rex Earl Bassett, Jr., was issued a patent on certain improvements in washing machines he had invented.

In 1935, an exclusive license under both the Chamberlin and Bassett patents in the field of *domestic laundry machines* was acquired

by Laundri-Matic Corporation, a New York corporation in which Chamberlin and Bassett each owned 26 of its 100 shares of authorized stock. On April 23, 1935, Laundri-Matic granted to Hydraulic Brake Company, a California corporation, an exclusive transferable license, in the domestic laundry field [2] only, to manufacture, use, and sell laundry machines covered by the Chamberlin and Bassett patents throughout the lives thereof. The agreement could be canceled by Hydraulic upon 60 days' notice; and by Laundri-Matic upon 60 days' notice if Hydraulic defaulted in royalty payments.

As of July 17, 1936, stockholders of Laundri-Matic and the number of shares held by each were:

| Name | Number of shares |
|---|---|
| Don O. Scott | 12 |
| Arthur A. Berard | 24 |
| Rex Earl Bassett, Jr | 26 |
| J. C. Rowland | 12 |
| John W. Chamberlin | 26 |
| Total | 100 |

Sometime after February 1935, but prior to July 17, 1936, the wife of Rex Earl Bassett, Jr., purchased 12 shares of Laundri-Matic stock from J. C. Rowland. Bassett's wife then sold these shares to Don O. Scott.

By an agreement dated July 17, 1936, Laundri-Matic assigned to Chamberlin the right to receive 20 per cent of all royalties accruing or thereafter paid to Laundri-Matic under the Hydraulic license. These payments were to be made directly to Chamberlin by Hydraulic. Chamberlin acquired this right to receive the royalty payments in exchange for 20 of his 26 shares of stock in Laundri-Matic. The instrument by which this assignment was effected was as follows:

KNOW ALL MEN BY THESE PRESENTS that whereas, The Laundri-Matic Corporation, a New York Corporation, is the owner of the entire right, title and interest in and to a certain patent license contract between it and Hydraulic Brake Company, a California corporation, dated April 23, 1935, and supplements, modifications, and additions thereto; and

WHEREAS HYDRAULIC BRAKE COMPANY is obligated to, and will be obliged, to make certain royalty payments to The Laundri-Matic Corporation in accordance with the terms of said agreement, during the life of said agreement and supplements, modifications, and additions thereto; and

WHEREAS JOHN W. CHAMBERLIN is desirous of purchasing a twenty per cent (20%) interest in and to all royalties hereafter paid or accruing under said license agreement and supplements, modifications, and additions thereto, to the Laundri-Matic Corporation by Hydraulic Brake Company; and

WHEREAS, The Laundri-Matic Corporation is desirous of selling a twenty

---

[2] Defined in a later supplemental agreement as a machine designed to handle 18 or less pounds of dry material in one loading, those designed to handle more than 18 pounds being designated commercial laundry machines.

per cent (20%) interest in and to said royalties to the said JOHN W. CHAMBERLIN.

Now, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, The Laundri-Matic Corporation does hereby sell, transfer, assign and set over unto JOHN W. CHAMBERLIN, his heirs, assigns and legal representatives, forever twenty per cent (20%) of all royalties accruing or paid after the date hereof, by Hydraulic Brake Company under and pursuant to the license agreement between The Laundri-Matic Corporation and Hydraulic Brake Company, dated April 23, 1935, and all supplements, modifications, and additions thereto.

Hydraulic Brake Company is hereby requested and directed to make payment of twenty per cent (20%) of said royalties in the future, directly to said JOHN W. CHAMBERLIN, his heirs, assigns, or legal representatives.

IN WITNESS WHEREOF, The Laundri-Matic Corporation has caused these presents to be duly signed and sealed by its corporate officers thereunto duly authorized, this 17th day of July, 1936.

THE LAUNDRI-MATIC CORPORATION
By Arthur A. Berard (signed)

CONSENT OF STOCKHOLDERS

We, the undersigned, stockholders of Laundri-Matic Corporation each holding the shares of stock set opposite his signature hereto and holding collectively all the shares of stock of said corporation, consent to this assignment.

| Name | | No. of Shares |
|------|---|------|
| D. O. Scott | (signed) | 12 |
| Arthur A. Berard | " | 24 |
| Rex Earl Bassett, Jr | " | 26 |
| J. C. Rowland | " | 12 |
| John W. Chamberlin | " | 26 |

By an agreement dated December 4, 1937, Laundri-Matic assigned to Chamberlin the right to receive an additional 6 per cent of the royalties payable under the Hydraulic license. This right to receive royalty payments was acquired in exchange for the remaining 6 shares of Chamberlin's stock interest in Laundri-Matic.

On December 7, 1937, Chamberlin transferred the 26 shares of stock to Laundri-Matic. On the same day Chamberlin assigned to Marian his 6 per cent interest in royalties payable under the Hydraulic license. Although the assignment states the receipt of $5 and other valuable considerations, no consideration was in fact paid, and the transfer of the 6 per cent royalty interest to Marian was a gift.

Laundri-Matic had few assets other than the right to receive royalty payments under the Hydraulic license.

On August 10, 1936, Hydraulic assigned to Bendix Home Appliances, Inc., a Delaware corporation, all right, title, and interest in the exclusive license it had received under the April 23, 1935, agreement with Laundri-Matic. Bendix agreed to pay all royalties and other amounts due Laundri-Matic and assumed all other obligations of Hydraulic under the license.

Chamberlin and Bassett, on December 24, 1937, formed the Chamberlin Bassett Research Corporation, hereafter referred to as Research, an Indiana corporation. The stock of the corporation was issued as follows:

| Name | Number of shares |
|---|---|
| Rex Earl Bassett, Jr. | 400 |
| Marion E. Bassett | 100 |
| John W. Chamberlin | 400 |
| Marian Chamberlin | 100 |
| Total | 1,000 |

Chamberlin and Bassett in November 1938 assigned to Research all of their right, title, and interest in and to inventions and patents in the field of *commercial laundry machines*. Research also acquired title to additional patent rights from various employees.

In February 1939, Research granted an exclusive license to Borg-Warner Corporation to manufacture, use, and sell for domestic use laundry machines and devices designed to handle more than 18 pounds of dry material in one load. Borg-Warner agreed to pay Research a royalty for each machine sold during each year the license was in effect with a minimum monthly royalty, and also agreed to furnish Research with written statements specifying the number of machines sold during each month. The agreement provided that it should remain in force until the last patent covered by it should expire, unless previously terminated as provided in the agreement. Borg-Warner had the right to cancel the agreement 90 days after giving written notice thereof, and Research could terminate the license upon 30 days' notice in the event of Borg-Warner's failure to pay royalties, render statements required by the agreement, and to comply with other obligations in the agreement, or in the event of bankruptcy, insolvency, or liquidation of Borg-Warner.

By agreement dated March 13, 1939, Research sold and assigned to Chamberlin and Bassett each a 50 per cent interest in and to all royalties thereafter accruing or paid by Borg-Warner under the Borg-Warner license.

On December 5, 1939, Marian purchased her husband's 400 shares of Research stock, and in June 1940 she purchased the 500 shares owned by Bassett and his wife, leaving her the sole stockholder of Research.

By corporate resolution adopted June 17, 1940, Chamberlin and Marian were authorized and empowered to sell any assets of Research. Pursuant to this resolution, various assets, property, equipment, machinery, and patent rights which Research had acquired were sold. It is not clear from the evidence whether any rights that

were retained by Research under the Borg-Warner license were distributed in liquidation or retained by the corporation, but on the advice of its attorneys, Research was not formally dissolved. However, essentially all of the assets of Research were thus disposed of during the year 1941.

By assignment dated August 25, 1940, Chamberlin sold to Marian all rights to receive royalties which had or might thereafter accrue to him under the license agreement between Research and Borg-Warner by reason of the assignment to him by Research of the right to receive such payments, and whatever rights might revert to him or Research in the event the Borg-Warner license should terminate.

By letter dated February 28, 1942, Research and Marian notified Borg-Warner of an intention to cancel the Borg-Warner license for default in payment of royalties and rendering certain statements called for by the license agreement. The notification was signed for Research by Chamberlin as president, and was also signed by Marian.

In a letter dated March 24, 1942, Borg-Warner denied that it was in default under the license agreement. The letter stated that it was not in default regarding the payment of royalties but had in fact advanced on behalf of Research a greater amount than was due as royalties under the license. This excess was being regarded as prepaid royalties. Concerning the allegation of default for failure to render statements of machines manufactured and sold by Borg-Warner, the letter states:

Technically, we may be in default under Section 1, Article IV, for not having reported each month the number of "Licensed Apparatus" manufactured and sold by us. However, we are reporting to you now that we have sold no "Licensed Apparatus" since the License Agreement was entered into, as you are fully aware.

Negotiations were conducted from April 1942 until April 1943 between Borg-Warner and Louis C. Chapleau, attorney for Marian, regarding the question of default.

On April 15, 1943, Chapleau, as trustee for Marian, purchased from Bassett his right to receive 50 per cent of the royalties payable under the Borg-Warner license, which he later transferred to Marian.

On April 17, 1943, the dispute with Borg-Warner was settled and the following letter of agreement addressed to Norge Division, Borg-Warner Corporation, was signed by Marian Chamberlin, Louis C. Chapleau, trustee, and Chamberlin Bassett Research Corporation, by Chamberlin as president:

GENTLEMEN:

The undersigned, being the owners of the entire interest arising out of and by reason of a certain option agreement dated December 1st, 1938 and a patent license agreement which became effective by a letter of acceptance dated

February 23rd, 1939 between Chamberlin Bassett Research Corporation and Borg-Warner Corporation, hereby acknowledge that all royalty payments due under and by virtue of the provisions of said license agreement have been fully paid up to April 1st, 1943.

We further agree that said license agreement is in full force and effect and that any notices of cancellation heretofore given for alleged breach of contract were premature and ineffective.

The undersigned further acknowledge receipt of the sum of $12,000 in payment of minimum royalties at the rate of $1,000 a month from April 1, 1943 to April 1, 1944. Earned royalties in excess of the minimum, if any, will be accounted for on April 1, 1944.

Thereafter all payments under the license agreement were made to Marian.

During the years here involved, Chamberlin and Marian received payments from Bendix representing their 20 per cent and 6 per cent interests, respectively, in the royalties payable by Bendix to Laundri-Matic in the following amounts:

| Year | John W. Chamberlin | Marian Chamberlin |
|---|---|---|
| 1947 | $58, 999. 70 | $17, 696. 91 |
| 1948 | 34, 480. 60 | 10, 344. 18 |
| 1949 | 10, 361. 70 | 3, 108. 51 |

Marian received payments from Borg-Warner during the years in question in the following amounts:

| | |
|---|---|
| 1947 | $12, 000. 00 |
| 1948 | 11, 000. 00 |
| 1949 | 59, 428. 03 |

Respondent determined in his notice of deficiency that the amounts petitioners collected from Bendix and Borg-Warner in the years involved were taxable as ordinary income rather than capital gain as reported on their returns; also "[i]t is held that the collections from the two above-named sources were not realized from the sale or exchange of a capital asset held for more than six months."

In the notice of deficiency mailed to Chamberlin, respondent determined that the $17,696.91 received by Marian from Laundri-Matic in 1947 and reported on her 1947 return was properly taxable to Chamberlin because Chamberlin's gift to Marian of a 6 per cent interest in anticipated collections from Bendix was ineffective for income tax purposes. Respondent abandoned this determination in the stipulation of facts between the parties and agreed that this income is taxable to Marian alone and is not taxable to Chamberlin. This income should be eliminated from the taxable income of Chamberlin in the Rule 50 computation.

It is stipulated that petitioners are not subject to additions to tax for the years 1948 and 1949 under the provisions of section 293(a), I.R.C. 1939.

OPINION.

*Issue 1.*

The first issue is whether the payments received by Chamberlin from Bendix in each of the years involved were taxable to him as ordinary income or capital gain.

Chamberlin received these payments by virtue of an agreement dated July 17, 1936, whereby Laundri-Matic assigned to him the right to receive 20 per cent of all royalties accruing or thereafter paid by Bendix, under an exclusive license agreement between Laundri-Matic and Hydraulic (whose interest was assigned to Bendix), in exchange for 20 shares of his stock in Laundri-Matic. There is no evidence of Chamberlin's basis in the stock and no unrecovered basis is claimed by petitioners.

It is clear that the payments received by petitioners from Bendix and Borg-Warner were in the form of royalties and taxable as ordinary income under section 22(a), I.R.C. 1939, unless allowed capital gains treatment under some specific provision of the Code or rule of law.

Chamberlin claims that under *Burnet* v. *Logan*, 283 U.S. 404, if the royalty interest he received in exchange for his stock in 1936 had no ascertainable value at that time, the transaction remained open, and under the doctrine of *Commissioner* v. *Carter*, 170 F. 2d 911 (C.A. 2), affirming 9 T.C. 364, and *Westover* v. *Smith*, 173 F. 2d 90 (C.A. 9), the royalty payments received in later years are a part of the consideration for the sale or exchange of his stock and are therefore taxable as capital gain.

Ordinarily, a sale or exchange of stock for cash or other assets is a closed transaction and any gain or loss, measured by the difference between the cash received plus the fair market value of the other assets received and the adjusted basis of the stock, is recognized for tax purposes at that time. *Burnet* v. *Logan*, *supra*, while not concerned with whether the income received by the taxpayer in that case was capital gain or ordinary income, laid the foundation for an exception to the usual tax treatment of such an exchange, holding that where the value of the contract right to receive future income could not be ascertained in the year of the exchange, the transaction would remain open to permit the taxpayer to recover her basis tax free before any of the income was taxable. The *Carter* and *Smith* cases, decided after the capital gain provisions had been adopted, relied on language used in the *Logan* opinion to hold that under such circumstances the amounts received in excess of the taxpayer's basis were *profit* and taxable as capital gain.

Respondent recognizes that Chamberlin's stock in Laundri-Matic was a capital asset which was sold or exchanged in 1936 for the right

to receive 20 per cent of the royalties paid under the Bendix agreement, and consistent with his acquiescence in the *Carter* case and his position stated in Rev. Rul. 58–402, both found in 1958–2 C.B. 15, concedes that if the right received by Chamberlin in this transaction had no ascertainable value at that time, petitioners' position is correct.

However, respondent argues that the rule of the *Carter* case does not apply to this case unless it is clearly shown that the contract right to royalties received by Chamberlin in 1936 had no ascertainable value at that time, and that petitioners have failed to carry their burden of proving this. Therefore, he argues, upon distribution to Chamberlin, the right to receive future royalties was an asset, in the form of a claim or chose in action, received by Chamberlin in exchange for his stock, the basis in which was its fair market value on the date of distribution, and that that transaction thereupon was closed; and that the amounts thereafter received by Chamberlin, after recovering his basis in this asset, were simply collections of the claim or chose in action, rather than consideration for the sale or exchange of a capital asset, and are therefore taxable as ordinary income, relying on *Pat O'Brien*, 25 T.C. 376, and *Osenbach* v. *Commissioner*, 198 F. 2d 235 (C.A. 4), affirming 17 T.C. 797.

We agree that petitioners have the burden of proving that the exchange of stock was not a closed transaction in 1936 because unless that was the situation, there is no sale or exchange of a capital asset from which the income received in the years here involved could flow, and respondent's determination must stand. Here, the only reason suggested by petitioners that this capital transaction should be kept open for tax purposes for these many years is that the asset received by Chamberlin in exchange for his stock had no ascertainable value in 1936. This they must prove to come within the exception to the general rule established by the *Logan*, *Carter*, and *Smith* cases, and to overcome the presumptive correctness of respondent's determination.

On the record before us, we are unable to make an affirmative finding that there was no ascertainable value of the contract right distributed to Chamberlin in exchange for his stock in 1936 or in 1937. There is nothing inherent in a contract or claim for the future payment of indefinite amounts that causes it to be insusceptible of valuation. The fair market value of such contracts was determined in *Pat O'Brien*, *supra*, *Boudreau* v. *Commissioner*, 134 F. 2d 360 (C.A. 5), affirming 45 B.T.A. 390, and *Commissioner* v. *Thompson*, 222 F. 2d 893 (C.A. 3), affirming 21 T.C. 448. See also *Gersten* v. *Commissioner*, 267 F. 2d 195 (C.A. 9), affirming in part and remanding in part 28 T.C. 756. As said in the opinion of this Court in the *Thompson* case, the task may be difficult but it is not insuperable. Given all

relevant evidence from which values are usually determined, it is only in rare and extraordinary cases that property would have no reasonably ascertainable fair market value. Such a statement, or words similar thereto, has long appeared in Commissioner's regulations, including Regulations 94, article 111–1, applicable to the income tax under the Revenue Act of 1936.

The only evidence we have in support of petitioners' claim that the right to receive royalties had no ascertainable value in 1936 is a copy of the license agreement itself. It may be true that, absent other facts which might help establish a value, it would be difficult to ascertain with any degree of certainty the value of the contract right to receive these royalties from the terms of the license agreement alone. But we have no evidence that there were not other facts relevant to the value of this right which would have permitted ascertainment of the value thereof. As a matter of fact, we have nothing in the record to show that Chamberlin did not actually place a value on it himself in 1936.

On the other hand, we do have evidence that 12 of the 100 shares of stock of Laundri-Matic were bought and sold twice within 16 months prior to July 17, 1936, in what we can assume were arm's-length transactions, at a time when about the only asset of Laundri-Matic was the right to receive these royalties. Unless there were other circumstances of which we are not advised, the sales price of this stock might very well have fairly represented the value of a proportionate interest in the sole asset of the corporation. *Boudreau* v. *Commissioner, supra.*

Furthermore, there is evidence that rights to receive a percentage of the Borg-Warner royalties were bought and sold during the years. If the parties could place a value on the right to receive these future royalties, it might well be that the value of the right to receive future Bendix royalties could also have been ascertained.

We cannot conclude as a matter of either fact or law, on the basis of the terms of the license agreement alone, that the value of a right to receive a percentage of the future royalties to be paid thereunder could not have been ascertained in 1936 and 1937. Lacking such conclusion, the transaction whereby Chamberlin exchanged his stock in Laundri-Matic for the right to receive royalties to be paid by Bendix was closed at the time of the exchange. The royalties received by Chamberlin during the taxable years have not been shown to be proceeds from the sale or exchange of a capital asset, and there being no claim that any part thereof represented a recovery of basis, are taxable as ordinary income. *Pat O'Brien, supra; Osenbach* v. *Commissioner, supra; May D. Hatch,* 14 T.C. 237, reversed on other grounds 190 F. 2d 254 (C.A. 2); *Miller* v. *United States,* 155 F. Supp. 767, affirmed per curiam 262 F. 2d 584 (C.A. 6); *Warren* v.

*United States*, 171 F. Supp. 846 (Ct. Cl.). We do not understand that petitioners dispute this tax treatment of the income, provided the stock transaction was closed in 1936—at least they do not argue to the contrary.

*Issue 2.*

The second issue is whether the payments received by Marian from Bendix in each of the years involved were taxable to her as ordinary income or capital gain.

Marian received these payments by virtue of the assignment to her of Chamberlin's right to receive 6 per cent of the royalty payments under the Laundri-Matic-Hyrdaulic agreement, which had been transferred to him by Laundri-Matic in exchange for 6 shares of his stock in Laundri-Matic under circumstances similar to those involved in the first issue.

Petitioners claim that the assignment by Chamberlin to Marian was a gift and, therefore, the income received by Marian retained the same taxable character as it would have had had it been received by Chamberlin, relying on *Commissioner* v. *Hopkinson*, 126 F. 2d 406 (C.A. 2), affirming 42 B.T.A. 580, and that the amounts received by Marian from Bendix were payments on the purchase price of Chamberlin's stock and were therefore taxable as capital gain.

Our discussion in issue 1 is equally applicable to Chamberlin's exchange of 6 shares of Laundri-Matic stock for this 6 per cent interest in the Hydraulic-Bendix royalties in 1937. We also find that this transaction was closed in 1937 and had Chamberlin received the royalties assigned to Marian, on the record before us, they would have been taxable to him as ordinary income. So on petitioners' own theory, the royalties received by Marian were taxable to her as ordinary income. It is not argued here as it was in *Don O. Scott*, 26 T.C. 869, that Marian herself made a sale or exchange of a capital asset which produced this income.

*Issue 3.*

The third issue is whether payments received by Marian from Borg-Warner Corporation in each of the years involved were taxable to her as ordinary income or capital gain.

Without repeating the details of the transactions, the pertinent parts of which are set out in our Findings of Fact, Marian received these payments under the following circumstances: Research was formed in 1937 and its capital stock was issued 400 shares to each of Chamberlin and Bassett and 100 shares to each of Marian and Bassett's wife. Chamberlin and Bassett assigned certain patents to Research. In 1939 Research granted an exclusive license to Borg-Warner to manufacture, use, and sell certain laundry machines for which Borg-

Warner agreed to pay a royalty for each machine sold, with a minimum monthly royalty. Research then assigned to each of Chamberlin and Bassett a 50 per cent interest in the royalties payable by Borg-Warner. Later in 1939 Marian purchased her husband's 400 shares of stock in Research, and in 1940 she purchased the remaining 500 shares from the Bassetts. In August 1940, Marian purchased Chamberlin's 50 per cent interest in the royalties and prior to April 17, 1943, she purchased, through her attorney, Bassett's 50 per cent interest in the royalties.

In 1942, a dispute arose between Borg-Warner and the patent and royalty owners. Borg-Warner was notified that its exclusive license was canceled, but by letter agreement of April 17, 1943, the dispute was settled. Thereafter all royalties were paid by Borg-Warner directly to Marian.

There being no sale or exchange of a capital asset by a predecessor in title to which Marian's Borg-Warner payments can be related, petitioner attempts to create a sale or exchange by Marian out of the reinstatement of the agreement with Borg-Warner, following a tortuous path something like this, as we understand it. As sole owner of Research, Marian distributed to herself in liquidation of Research the legal ownership of the patent involved. When the dispute with Borg-Warner arose, she, as owner of the patent and as owner of Chamberlin's 50 per cent royalty interest, canceled the Borg-Warner license for alleged failure to pay minimum royalties and render certain accountings. This caused the conditional title of Borg-Warner to revert to her and become merged with her bare legal title. This constituted a capital asset in her hands. When the dispute with Borg-Warner was settled and the exclusive license agreement was reinstated, this was a new granting of an exclusive license to make, use, and sell the patented machines and constituted a sale by her of the patent. Inasmuch as she had acquired "substantially all rights" in the patent upon the cancellation of the Borg-Warner license in April 1942, she had held the rights sold to Borg-Warner in the reinstatement for more than 6 months and is therefore entitled to treat the amounts thereafter received as long-term capital gains.

Respondent's position is simply that Marian's right to receive these royalties was a claim or chose in action, and there being no sale or exchange thereof, the amounts received in satisfaction of the claim were ordinary income. Respondent claims that there is no clear evidence that the patent was ever distributed to Marian by Research in the first place and that the settlement of the dispute with Borg-Warner did not amount to a sale or exchange in the second place. We agree with respondent on this issue.

The only competent evidence with respect to ownership of the patent is that it was originally assigned to Research by Chamberlin

and Bassett, that after Marian acquired all the stock of Research a resolution was adopted by the corporation authorizing Chamberlin to dispose of *any* of the assets of Research, the testimony of Chamberlin that he thereafter sold most of the assets of Research and that the rest of the assets eventually wound up in the hands of Marian after the corporation folded up in 1941. On the other hand, there is no evi-. dence that Research actually assigned the patent to Marian, or that Research was ever completely liquidated, and Research was a party to both the April 1942 letter to Borg-Warner informing it of termination of the license agreement and the letter of April 17, 1943, settling the dispute. Without title to the patent it is quite doubtful that any agreement made by Marian with Borg-Warner ostensibly reinstating the exclusive license agreement, would qualify as the sale or exchange of a capital asset.

Furthermore, we do not think that, for tax purposes at least, there was such a termination of the exclusive license agreement as would give Marian a right she could in effect resell to Borg-Warner. Petitioner argues that in patent law a unilateral termination of an exclusive license agreement by the licensor for failure to pay minimum royalties automatically revests all rights in the licensor. We have examined the cases cited by petitioner in support of this theory, as well as some other cases on the subject, and there would appear to be some conflict on the point. See Ellis, Patent Assignments and Licenses, sec. 800–801. But in any event, for purposes of determining whether there was a sale or exchange under section 117 of the 1939 Code, we believe we must look to the realities of the situation. Further, petitioner agrees the termination can be set aside by the licensee going into court if the termination was not really valid under the agreement.

Here, petitioner claimed a failure to pay minimum royalties and make certain reports. Borg-Warner replied immediately that it had overpaid the minimum royalties because of funds advanced for various reasons and that the failure to make certain reports was only a technical violation. The parties negotiated a settlement of the dispute without going to court and agreed that the original "license agreement is in full force and effect and that any notices of cancellation heretofore given for alleged breach of contract were premature and ineffective." In our opinion this would nullify the cancellation as effectively as though a court had declared it null and of no effect.

It appears that both the licensor and licensee retained the same rights and obligations they had before the notice of cancellation and that payments thereafter made by Borg-Warner to Marian Chamberlin were based on the original agreement from Research to Borg-Warner and the assignment of the right to receive the royalties by Research to Chamberlin and Bassett, which rights were purchased

from them by Marian. Marian did not receive the payments as the result of a sale or exchange of a capital asset either by her or by anyone else. *Don O. Scott, supra; Bratter* v. *United States*, 161 F. Supp. 365. The payments were received as collection of a claim for royalties due and to the extent they exceed her basis, are taxable as ordinary income. *Osenbach* v. *Commissioner, supra.*

Because of other issues agreed upon by the parties by stipulation,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

---

PIERCE, *J.*, concurring in part and dissenting in part: Notwithstanding that I concur in the Court's ultimate holding on each of the three issues stated in its Opinion (i. e., that the royalty payments involved in said issues are taxable as ordinary income, and not as capital gain), I am impelled to dissent from the Opinion in respect of issues 1 and 2 which pertain to the royalties which petitioners received under the intercorporate patent license agreement between Laundri-Matic Corporation and Hydraulic Brake Company (which license agreement was later taken over by Bendix Home Appliances, Inc.).

I think that in deciding these two issues, the Court has begged the *basic legal problem* presented, which is: Whether the Laundri-Matic transactions of July 17, 1936, and December 4, 1937, through which Chamberlin obtained the rights to the royalties involved (part of which rights he transferred to his wife), did *as a matter of law* qualify as "exchanges of capital assets." The Court has *assumed* or concluded, without statement of reasons (and I believe erroneously), that the transactions did so qualify; and then, based on such assumption, has arrived at its ultimate holdings through consideration of various other factual and legal problems (which I think should not have been reached or decided), such as: Whether the proceeds of such assumed "exchanges" were susceptible of valuation in 1936 and 1937; whether the petitioners bore their burden of proving that such proceeds were not susceptible of valuation; whether the case falls within "an exception to the usual tax treatment of such an exchange"; and whether a deemed rationale of the decisions in *Burnet* v. *Logan*, 283 U.S. 404, and certain other cited cases, is here applicable. I think that in making said basic assumption, the Court has viewed the 1936 and 1937 transactions too narrowly, as though they were isolated deals between Laundri-Matic and Chamberlin alone (which was not so); has failed to give effect to all the evidence; and has placed too much emphasis on mere forms and formalisms, as distinguished from what actually was done.

1. Whether a particular transaction qualifies as an "exchange of capital assets," is a question of law; and, when presented by the plead-

ings (as it was presented here as the starting point in a capital gains problem) it should be resolved by applying the law to all the material facts and surrounding circumstances disclosed by the record. In the instant case the record, including more particularly Chamberlin's own pleadings and testimony and also both instruments of "assignment" that were obtained by him, clearly discloses the history, character, purpose, and effect of said 1936 and 1937 transactions; and, in my view, definitely shows that they were not "exchanges of capital assets." Rather their true character and effect was as follows:

Neither of the transactions of July 17, 1936, and December 4, 1937, was an isolated transaction between Laundri-Matic and Chamberlin alone; rather, each was part of a prearranged plan worked out by *all* the stockholders of Laundri-Matic including Chamberlin, at a meeting held on or shortly before July 17, 1936, under which most of the anticipated future income of said corporation from its patent license agreement with Hydraulic was "assigned" by Laundri-Matic to its stockholders, in shares proportionate to their respective equity interests in the corporation, solely for the stockholders' own personal benefit and for no business purpose. Another feature of said plan was, that the corporation would not be dissolved or be either partially or wholly liquidated; and the reason for this was that the continued existence of Laundri-Matic was necessary for the continued protection of the "assignees," because the corporation was the licensor under the patent license agreement, the royalties were payable to it under the terms of the agreement, and only by reason of its direction and request were such royalties to be withheld at their source and be paid directly to the holders of the instruments of "assignment."

The principal effects of said 1936 and 1937 transactions were, that the corporation's anticipated income which normally would be available for dividend distributions, was earmarked in advance for distribution to the then stockholders, by name and in fixed proportions, rather than being left for distribution in respect to the shareholdings at the time when such income was realized; and that, as before stated, such future income of the corporation was, in accordance with its prearranged direction and request, withheld at its source and paid directly to the holders of the "assignments." Each instrument of "assignment" obtained by a stockholder, evidenced an interest in the corporation's future income, which was proportionate to such stockholder's equity interest in the corporation; and, under the original plan, as each "assignment" was delivered to a stockholder, the number of shares of stock which he then held was to be correspondingly decreased. Also, each instrument of "assignment" was transferable, in the same manner as the certificates of stock; and, unlike assignments of accounts receivable which would gradually decrease in value as

payments thereon were received, these instruments of "assignment" would, like the shares of stock, increase in value as the flow of royalties thereunder increased or gave prospect of increasing. Also the holders thereof, like the holders of shares of stock, carried the risks of the Laundri-Matic business fortunes, which in turn depended upon the success of the management, advertising, and sales activities of Hydraulic and Bendix. Viewing actualities, as distinguished from the prearranged forms and formalisms employed, these instruments of "assignment" were merely substituted evidences of the same proportionate equity interests in Laundri-Matic Corporation.

It is true that the "assignments" apparently carried no voting rights. But this would appear to be a matter of lesser importance; for Laundri-Matic, at the time when the instruments of "assignment" were delivered, had subjected its patents to an exclusive patent license agreement that was to operate in perpetuity so long as the licensee continued to manufacture and sell thereunder; its operations had been reduced to little else than holding the long-term patent license agreement, accruing the income therefrom, and seeing that such income was paid directly to holders of the instruments of "assignment," in accordance with its directions. Thus no active participation by the equity holders was necessary. The fact that the corporation remained in existence only to maintain a stock transfer book and the license agreement, is immaterial; for the relationship between it and its equity holders continued, and any distributions of income to the equity holders would be in performance of the obligation owed by the corporation to them. *United States* v. *Joliet & C. R. Co.*, 315 U.S. 44. Also, in considering dealings between a corporation and its equity holders, neither the name nor the form of the instruments by which the equity interests are evidenced is a controlling factor; nor is it important whether such instruments carry all the privileges normally attributable to shares of stock. See *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 57-58, affd. (C.A. 7) 254 F. 2d 51.[1]

---

[1] It is doubtful whether, as a matter of law, the present instruments of "assignment" can have any validity, except as substituted evidences of the holders' equity interests in Laundri-Matic; or whether such "assignments" can, as a matter of law, provide the "consideration" for any exchange of capital assets.

The income of all corporations is subject to claims for taxes and claims of creditors—both of which have priority over the interests of the equity owners. Anticipatory assignments of income by a corporation, which are not made pursuant to a plan for liquidation, do not eliminate the corporation's liability for income taxes on such income. *United States* v. *Joliet & C. R. Co.*, 315 U.S. 44. Nor do they eliminate the potential secondary liability for such taxes, in those who received the income without adequate consideration.

I believe that in situations like the present, where stockholders acting in their capacities as stockholders cause the corporation to assign to them its income for an indefinite future period (in this case 94 per cent of such income), such stockholders cannot avoid the above-mentioned principles of corporation law and tax law, merely by their subsequent surrender to the corporation (by agreement or otherwise) of their shares of stock from which the income potential has been shorn (or indeed by the surrender of any other property), as purported "consideration" for the anticipatory assignments. Such "assignments," if they have any validity at all, are distributed by the corporation *pursuant to*

# 1114

2. As regards the transactions on July 17, 1936, there is another and even more cogent reason why these cannot qualify as an "exchange of capital assets." Such reason is that, in said transactions, neither Chamberlin nor any of the other stockholders except Scott, actually surrendered, transferred, or caused to be canceled, any of their shares of stock as had originally been planned. The exception with respect to Scott, who was not one of the four original stockholders of Laundri-Matic and who enjoyed only a temporary in-and-out participation in the corporation, was due to special circumstances described in Chamberlin's testimony, which are not here pertinent and need not here be reviewed.

In said 1936 transactions, 82 per cent of the anticipated future royalty income of Laundri-Matic was "assigned" by it to its stockholders, as is stated by Chamberlin in his pleadings; and Chamberlin obtained an instrument of "assignment" evidencing his right to receive 20 per cent of the same. It is this "assignment" upon which he here relies to obtain capital gains treatment for the royalties which he received in 1947, 1948, and 1949. But, notwithstanding the original plan that Chamberlin and the other three original stockholders would surrender corresponding portions of their shareholdings, none of them did so. To the contrary, each of these original stockholders including Chamberlin, continued to retain all his shares. And about 1½ years later, when another meeting of the Laundri-Matic stockholders was held and additional "assignments" of anticipated income of that corporation were authorized, all these original stockholders continued to act in the capacity of stockholders; and they then executed a written endorsement appearing on the additional instrument of "assignment" which Chamberlin obtained, wherein they represented that they held *all* the shares of the corporation's stock, in the identical share amounts, which they had held prior to the earlier 1936 transactions.

Even if said stockholders had carried out their original plan of surrendering part but not all their shares, this would not have effected an "exchange of capital assets"; for they would still have continued to hold substantially the same equity interests as stockholders, even though the same would have been evidenced by fewer shares. There would simply have been a bookkeeping revision of the corporation's capital accounts (a reduction of outstanding shares, as distinguished

*the obligation owed by it to its stockholders,* under the corporation-stockholder relationship; and they cannot properly be deemed or regarded to be the *quid pro quo* for any sale or exchange of property.

If this were not so, the stockholders of any close corporation could, after authorizing "assignments" to themselves of substantially all the corporation's income for an indefinite future period, surrender to the corporation some property of uncertain value; thereby establish an "exchange" of capital assets which are considered to have "no ascertainable values"; and thereafter, not only escape all the priorities and obligations attaching to equity ownership, but also obtain capital gains treatment on the income which flows to them from the corporation's continued operation.

from a stock split), with the stockholders continuing to hold the same proportionate equity interests. But in the 1936 transaction as it actually was carried out, there was no adjustment whatever of the shares of the original stockholders, including Chamberlin.

Thus I think there can be no possible justification for concluding that there was an "exchange of capital assets" by Chamberlin; and that the Court's contrary assumption in its Opinion is unwarranted.

3. As regards the later transactions on December 4, 1937, these likewise were not isolated dealings between Laundri-Matic and Chamberlin alone. Rather, as revealed by Chamberlin's pleadings, an additional 12 per cent of Laundri-Matic's anticipated future income was at that time "assigned" by it to its stockholders, pursuant to a meeting of the stockholders held on that date; and Chamberlin thereby obtained an additional 6 per cent interest in such income.

Neither the minutes of said stockholders meeting, nor the stock record books, nor any of the corporation's accounts were offered or received in evidence; and also there is little or no testimony, other than legal conclusions that there was an "exchange," which bears on what actually took place at that meeting. Chamberlin stated in his pleadings that "a further distribution in liquidation" was there authorized; but the corporation was not dissolved, and it was not either partially or wholly liquidated. To the contrary it continued to operate in accordance with the plan agreed upon at the meeting of the stockholders which preceded the prior assignments in 1936; and it retained the right to the unassigned portion of its future income. The new instruments of "assignment" were in form identical to the previous ones; they operated in the same manner; and they evidenced merely a repeat transaction under the original prearranged plan.

There is evidence that, about 3 days after the new "assignments" were delivered, Chamberlin endorsed (and presumably delivered) to Laundri-Matic, his certificate for all his 26 shares of stock, which had been issued to him through certificate No. 1 on December 14, 1935. But, again looking to substance as distinguished from mere formalisms, this had little substantial effect. By that time, 94 per cent of the corporation's anticipated income for an indefinite future period, had been drained off by the "assignments"; the corporation had no active business operations, other than to hold the license agreement which was to operate in perpetuity so long as the licensee or its successors continued to manufacture and sell thereunder; and the holders of the instruments of "assignment" had already made arrangements, satisfactory to them, for continuing the existence of the corporation, primarily for their benefit. Thereafter, as before suggested, the holders of such "assignments" were the ones who carried the risks of the corporation's fortunes; they were entitled to receive substantially all the royalty income which Laundri-Matic thereafter realized;

and actually, they were the true equity owners. In such circumstance, it made little practical difference how their equity interests were evidenced.[2]

Moreover, at the time when these additional instruments of "assignment" were delivered, "the umbilical cord between it [the corporation] and the stockholders * * * [had] not been cut" (quotation from *United States* v. *Joliet & C. R. Co., supra*); for these additional instruments of "assignment" were authorized by Chamberlin and the three other original stockholders, in the capacity of stockholders, at the stockholders meeting on December 4, 1937; and the "assignments" as before noted, bore endorsements of consent signed by said individuals as stockholders, in which they represented that they were *all* the stockholders of said corporation at the time the instruments were delivered. Such delivery did truly represent "a further distribution" to the stockholders; but it was not "in liquidation," as pleaded. I think the subsequent surrender of shares under the circumstances here present, cannot as a matter of law qualify as an "exchange of capital assets" within the meaning of the Internal Revenue Code.

---

The decisions in *Burnet* v. *Logan, supra,* and the other cases cited in the Court's Opinion, are not apposite in a situation like the present. The more pertinent legal principles are those which were stated and applied in *United States* v. *Joliet & C. R. Co., supra; Helvering* v. *Horst,* 311 U.S. 112; *Burnet* v. *Wells,* 289 U.S. 670; *Gregory* v. *Helvering,* 293 U.S. 465; and *Emanuel N. (Manny) Kolkey, supra.*

Both Chamberlin and his wife, in the separate income tax returns which they filed for the year 1947 (which is the first year here involved), reported the Laundri-Matic royalties which they received in said year, as ordinary income. The Commissioner thereafter, in his notices of deficiency for all years involved, determined that such royalties were ordinary income. Similarly, this Court has now held that they were ordinary income—with which holding I agree, except that I believe it should have been based on the more basic reason above mentioned, that such royalties were not received pursuant to any "exchange of capital assets."

The importance of determining the true character of the transactions of 1936 and 1937 is, that the question of whether these transactions did as a matter of law qualify as "exchanges of capital assets," is a continuing one. Five stockholders participated in these transactions; the various instruments of "assignment" which they obtained therein are transferable, as is shown by the transfer to Chamberlin's wife; and the period during which the "assignments" are to remain operative is continuous, so long as the licensee of the patent license

---

[2] See footnote 1 *supra.*

agreement (or its successors) manufactures and sells machines thereunder. Since the Court has decided the present case largely on a burden-of-proof basis, after having *assumed* that the 1936 and 1937 transactions qualify as "exchanges of capital assets," a continuance of litigation directed toward a curing of such procedural defect (but with the above-mentioned basic legal problem still lurking and unsettled), can be anticipated. I think the Court could and should have here decided such basic problem; and thereby have quieted this area of further controversy.