REX EARL BASSETT, SR., AND DOT BASSETT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72580.    Filed May 11, 1961.

*Robert M. Curtis, Esq.*, and *George H. Gore, Esq.*, for the petitioners.

*Hugh G. Isley, Jr., Esq.*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Year | Amount |
| --- | --- |
| 1951 | $1,793.72 |
| 1952 | 854.98 |
| 1953 | 986.36 |
| 1954 | 512.50 |
| 1955 | 557.71 |

The sole issue to be decided is whether royalty payments received by petitioners during the years 1951 to 1955, inclusive, represent ordinary income or capital gain.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Rex Earl Bassett, Sr., and Dot Bassett, petitioners, are husband and wife residing during the years here involved at Fort Lauderdale, Florida. Petitioners filed their joint income tax returns for the years 1951 to 1955, inclusive, with the director of internal revenue at Jacksonville, Florida.

On January 3, 1933, John W. Chamberlin was issued a patent covering a cleansing machine he had invented.

Prior to February 15, 1935, Rex Earl Bassett, Jr., the son of petitioners, filed an application for a patent covering certain improvements in cleansing machines.

During 1933 Chamberlin assigned his patent, insofar as it was applicable to commercial drycleaning machines, to National Rubber Machine Company, an Ohio corporation. He subsequently assigned all his remaining right, title, and interest in his patent to John W. Chamberlin, Inc.

On February 16, 1935, Chamberlin and Chamberlin, Inc., granted to Laundri-Matic Corporation, a corporation organized under the laws of New York, an exclusive license in the field of domestic laundry machines only, to make, sell, and use such machines covered by the Chamberlin patent throughout the United States, its territories, and possessions. They also granted Laundri-Matic the right to assign the foregoing license or to sublicense it to others.

On February 15, 1935, Bassett, Jr., transferred to Laundri-Matic all his interest in his patent application. On the same date, Laundri-Matic granted back to Bassett, Jr., an exclusive license to manufacture, use, and sell machines covered by his patent application, except in the field of domestic laundry machines.

On April 23, 1935, Laundri-Matic granted Hydraulic Brake Company, a California corporation, an exclusive transferable and divisible license to manufacture, use, and sell throughout the United States and its territories domestic laundry machines covered by the Chamberlin patent and the Bassett patent application, together with all inventions connected with such machines during the life of every patent issued or to be issued covering such inventions. After August 23, 1936, the agreement could be canceled without cause by Hydraulic upon 60 days' notice, and it could also be canceled by Laundri-Matic upon 60 days' notice in the event Hydraulic defaulted in royalty payments.

On the same date, April 23, 1935, Hydraulic, Bassett, Jr., Chamberlin, and John W. Chamberlin, Inc., entered into an agreement which provided for the employment by Hydraulic of Bassett, Jr., and Chamberlin as consulting engineers. This agreement also provided for the granting of a license to Hydraulic by Chamberlin, Bassett, Jr.,

and John W. Chamberlin, Inc., covering foreign rights to the inventions and patents held by the grantors relating to domestic washers and laundry machines. The foreign license was identical in its terms and conditions with the license granted Hydraulic by Laundri-Matic, except with respect to royalties payable thereunder. Hydraulic agreed to pay $5,000 in advance royalties to Laundri-Matic.

On February 10, 1936, petitioner Dot Bassett acquired by gift from J. C. Rowland 12 shares of stock in Laundri-Matic. On March 17, 1936, she sold these shares to Don O. Scott, an officer of Bendix Home Appliances, Inc., for a consideration of $2,500.

As of July 17, 1936, the stockholders of Laundri-Matic and the number of shares held by each, were as follows:

|  | Shares |
|---|---|
| Don O. Scott | 12 |
| Arthur A. Berard | 24 |
| Rex Earl Bassett, Jr. | 26 |
| J. C. Rowland | 12 |
| John W. Chamberlin | 26 |
| Total | 100 |

Under an agreement executed July 17, 1936, Laundri-Matic assigned to Bassett, Jr., the right to receive 20 percent of all royalties accruing or thereafter paid to Laundri-Matic under the Hydraulic license. The assignment was made "in consideration of One Dollar ($1.00) and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged." Royalty payments were to be made directly to Bassett, Jr., by Hydraulic. This agreement was executed by Laundri-Matic pursuant to the consent of all its stockholders.

On July 17, 1936, Laundri-Matic made similar assignments to certain of its other stockholders of additional rights to royalty payments under the Hydraulic license in approximate proportion to their stockholdings.

Pursuant to agreements written in substantially the same form as the instrument by which the 20 percent interest in royalty payments was assigned to Bassett, Jr., 82 percent of the rights of Laundri-Matic to receive royalty payments from Hydraulic was assigned to various stockholders as of July 17, 1936.

On August 10, 1936, Hydraulic assigned to Bendix Home Appliances, Inc., a Delaware corporation, all of its right, title, and interest in the exclusive license it had received from Laundri-Matic under the agreement of April 23, 1935, as well as its rights in certain other patents and licenses. Bendix agreed to pay all royalties and other amounts due Laundri-Matic and to assume all the other obligations of Hydraulic under the license. It was agreed that upon execution

of this assignment, Bendix would pay Laundri-Matic $10,000 representing advance royalties.

On November 13, 1937, Bassett, Jr., and Chamberlin granted Bendix an exclusive license to make, use, and sell domestic laundry machines under all the inventions, patents, and patent applications then or thereafter made or controlled by either of them, in consideration of which Bendix agreed to pay them a royalty on each domestic laundry machine sold by it or its licensees on which it was not obligated to pay royalties to Laundri-Matic. Bendix granted to Chamberlin and Bassett, Jr., a license under its existing and future patents and patent applications to make, use, and sell commercial laundry machines.

The first production of the automatic washing machine as a test item was made in October 1937. A number of mechanical defects developed in the. first model, and Bendix received numerous complaints from its dealers concerning the poor operation of its product. The first commercially satisfactory washer was not developed until late in 1938. The officers of Bendix threatened a number of times from October 1, 1937, through February 1938 to abandon the development and production of the automatic washer if the numerous mechanical problems curtailing the marketability of its product could not be solved.

Pursuant to an agreement executed December 4, 1937, Laundri-Matic assigned to Bassett, Jr., the right to receive an additional 6 percent of the royalties payable under the Hydraulic license and executed a like assignment to another stockholder disposing of a 6 percent royalty interest to him. These assignments were also executed pursuant to the consent of all the stockholders of Laundri-Matic. The terms of these assignments were practically identical with the assignments executed by Laundri-Matic on July 17, 1936.

Under the assignments of December 4, 1937, by which Laundri-Matic transferred an additional 12 percent of its rights to receive royalty payments from Hydraulic to two of its stockholders in proportion to their stockholdings, it disposed of all but 6 percent of its principal if not its sole asset. However, Laundri-Matic has not been dissolved.

On or about December 10, 1937, Bassett, Jr., assigned his right to 6 percent of such royalty payments as might in the future be due from Hydraulic, to his parents, Rex Earl Bassett, Sr., and Dot Bassett, in equal shares or to the survivor in the event of the death of either.

Royalty payments totaling $14,425 were paid by Bendix for the period October 1, 1937, to December 31, 1937, to the stockholders of Laundri-Matic. Petitioners' interest in such royalties was as follows:

| Petitioner | 1937 | | Total |
|---|---|---|---|
| | November | December | |
| Rex Earl Bassett, Sr. | $232.91 | $199.84 | $432.75 |
| Dot Bassett | 232.91 | 199.84 | 432.75 |
| Total | | | 865.50 |

Royalties were paid by Bendix for each month of 1938. During 1938 the stockholders of Laundri-Matic received a total of $42,266 in royalty payments from Bendix. Of this amount, each of the petitioners received $1,267.98, which represented his or her individual 3 percent interest in the Laundri-Matic royalties.

On December 17, 1940, a patent was issued to Laundri-Matic pursuant to the application of Bassett, Jr., filed prior to February 15, 1935, of which Laundri-Matic was the assignee.

In 1949 controversies arose among Bendix Home Appliances, the parties claiming royalty payments due under the April 23, 1935, license agreement executed by Laundri-Matic and Hydraulic, and the parties claiming royalty payments under the license agreement executed November 13, 1937, by Bassett, Jr., Chamberlin, and Bendix. Such controversies involved a dispute as to the scope of the Bassett patent in addition to other matters.

On October 26, 1949, Bendix filed an interpleader action in the United States District Court for the Southern District of New York against Laundri-Matic and all rival royalty claimants seeking a determination of its rights and obligations.

On January 3, 1950, the Chamberlin patent expired.

On or about December 18, 1950, while these controversies were still in litigation, Bendix sold all of its assets to Avco Manufacturing Corporation, a Delaware corporation, and Avco thereby became the assignee both of the agreement between Laundri-Matic and Hydraulic executed April 23, 1935, and also the agreement executed November 13, 1937, by Chamberlin, Bassett, Jr., and Bendix. Avco assumed payment of all royalties payable under each of these agreements and Bendix was dissolved. Avco continued thereafter to manufacture and sell domestic washing machines.

On or about May 1, 1951, the pending litigation was terminated through a written agreement executed by Avco, Laundri-Matic, Chamberlin Bassett Research Corporation,[1] all of these persons claiming under the agreement between Hydraulic and Laundri-Matic executed April 23, 1935, and all of the persons claiming under the

---

[1] An Indiana corporation claiming to be a successor in interest of John W. Chamberlin and Rex Earl Bassett, Jr., to certain of their rights under the agreement of November 13, 1937. So far as is shown by the record, the claims of Chamberlin Bassett Research Corporation have no significance concerning the issue here involved.

November 13, 1937, agreement between Bendix, Chamberlin, and Bassett, Jr.

Petitioners received payments from Avco during the years and in the amounts as follows:

| Year | | Amount |
|---|---|---|
| 1951 | Prior to May 1, 1951 | $5,008.88 |
| | After May 1, 1951 | 7,862.86 |
| 1952 | | 5,572.45 |
| 1953 | | 6,949.90 |
| 1954 | | 4,966.00 |
| 1955 | | 5,807.42 |

Petitioners reported the $5,008.88 amount received by them from Avco prior to May 1, 1951, on their joint return for 1951 as ordinary income. They reported the $7,862.86 received by them from Avco after May 1, 1951, as long-term capital gain on their 1951 return and subsequently reported amounts received from Avco during 1952 to 1955, inclusive, as long-term capital gain.

### OPINION.

Petitioners contend that the royalty interest received by Bassett, Jr., from Laundri-Matic under the assignments of July 17, 1936, and December 4, 1937, in exchange for his stock in that corporation, had no reasonably ascertainable fair market value on those dates, and that the transactions therefore remained open so that the subsequently received royalty payments constitute part of the consideration received in exchange for the stock and are taxable as long-term capital gain.

In support of their position, petitioners claim that if, as they contend, the value of their contractual right to receive future royalty income could not be ascertained at the time of acquisition under *Burnet* v. *Logan*, 283 U.S. 404; *Commissioner* v. *Carter*, 170 F. 2d 911, affirming 9 T.C. 364; and *Westover* v. *Smith*, 173 F. 2d 90, the transactions should not be recognized for tax purposes but should remain open so as to permit them to report the future proceeds in the years of realization. The petitioners make the further contention that the receipt of the rights to a percentage of the proceeds of the license agreements was in exchange for the Laundri-Matic stock of Bassett, Jr., and represented either a partial liquidation or a distribution out of capital under section 115(d) of the Revenue Act of 1936, under which they contend any resulting gain would be taxable as long-term capital gain. The transaction by which Bassett, Jr., on December 10, 1937, assigned a 6 percent royalty interest to his parents (petitioners) is not in issue here and is not regarded by the parties as in issue, nor is it questioned that under *Commissioner* v. *Hopkinson*, 126 F. 2d 406, affirming 42 B.T.A. 580, the character of the royalty payments in the hands of petitioners is the same as it would be in the hands of the assignor.

The respondent denies that any exchange of Laundri-Matic stock for assets of that corporation took place which would give rise to capital gains treatment and contends that petitioners have failed to carry their burden of establishing that the contract rights to future royalty payments received by Bassett, Jr., on July 17, 1936, and December 4, 1937, had no reasonably ascertainable fair market value as of those dates. Consequently, respondent has taken the position that since the payments received by petitioners during the years in issue were in the form of royalties, they represented simply the collection of a claim rather than consideration for the exchange of a capital asset and are therefore taxable as ordinary income under section 22(a) of the Internal Revenue Code of 1939 and section 61 of the 1954 Code. The respondent cites *John W. Chamberlin*, 32 T.C. 1098, affd. 286 F. 2d 850 (C.A. 7), as controlling on the issue of the ascertainability of the fair market value of the royalty assignments in question.

In *John W. Chamberlin, supra,* we were presented with the question of whether or not royalty contracts identical to those here involved had a reasonably ascertainable fair market value at the time of assignment to Chamberlin on July 17, 1936, and December 4, 1937. The parties treated the transactions by which Chamberlin received assignments of a 26 percent royalty interest in the Hydraulic license agreement as an exchange of assets for his 26 shares of stock in Laundri-Matic. We assumed that the fact of an exchange had been conceded. The respondent has made no such concession here.

We find, however, from evidence of record and because petitioners have failed to sustain their burden of proof that we do not reach the question whether the assignments of royalty income executed on July 17, 1936, and December 4, 1937, had a reasonably ascertainable fair market value on those dates. If the transactions involved constitute a distribution in partial liquidation of Laundri-Matic, no sale or exchange within the meaning of section 117(a) of the Revenue Act of 1936 was possible, and in that event we are not concerned with determining whether the royalty assignments had a reasonably ascertainable fair market value. *Maurice A. Mittelman*, 5 T.C. 932; *Harold F. Hadley*, 1 T.C. 496; and *William A. Smith*, 38 B.T.A. 317.

Although petitioners in their reply brief seek to abandon their original contention that the transactions constituted a partial liquidation, we are of the opinion that such is the case, and that it is dispositive of the issue before us.

The record shows that all but 6 percent of Laundri-Matic's only asset had been distributed to its stockholders as of December 4, 1937; that it was intended by the corporation and its stockholders that its stock in the hands of its distributees was to be surrendered and, in fact, it was so surrendered; and that Laundri-Matic carried on no

business activity thereafter except to hold its remaining 6 percent interest in its original right to receive royalty income. Coupled with this evidence is the failure on the part of petitioners to show that there was no "complete cancellation or redemption" of the surrendered stock in pursuance of a partial liquidation of Laundri-Matic under section 115 (i) of the Revenue Act of 1936.[2] In view of the evidence of record and the failure on the part of petitioners to show that the shares of stock reacquired by Laundri-Matic were held in treasury, we find that the stock was retired or canceled and that the transactions constituted a partial liquidation of Laundri-Matic on July 17, 1936, and December 4, 1937, within the meaning of section 115(i) of the Revenue Act of 1936. *Maurice A. Mittelman, supra; R. W. Creech,* 46 B.T.A. 93; and *W. C. Robinson,* 42 B.T.A. 725. There was no law in effect in 1936 or 1937 which provided for the treatment of gain received under a partial liquidation as capital gain. Section 115(c) of the 1939 Code which in effect extended long-term capital gains benefits to gains realized from a partial liquidation was added to the Code by the Revenue Act of 1942, and is prospective only in its application. Section 115(c) of the Revenue Act of 1936 which applies to the transactions here in question, since it governs the taxable years 1936 and 1937 in which those transactions occurred, provided in effect that gain realized from a distribution in partial liquidation of a corporation is taxable as ordinary income.[3]

Consequently, any royalty payments received during the years in issue pursuant to the transactions in question by Bassett, Jr., or his assignees would necessarily represent ordinary income taxable to them under section 22(a) of the 1939 Code and section 61(a) of the 1954 Code.

*Decision will be entered for the respondent.*

---

[2] Revenue Act of 1936.
SEC. 115. DISTRIBUTIONS BY CORPORATIONS.
(i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.
[3] Revenue Act of 1936.
SEC. 115. DISTRIBUTIONS BY CORPORATIONS.
(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117(a), 100 per centum of the gain so recognized shall be taken into account in computing net income, except in the case of amounts distributed in complete liquidation of a corporation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation of redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding two years from the close of the taxable year during which is made the first of the series of distributions under the plan. In the case of amounts distributed (whether before January 1, 1934, or on or after such date) in partial liquidation (other than a distribution within the provisions of subsection (h) of this section of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits.